UNITED STATES of America,
Plaintiff–Appellee,

v.

Guy BUFFEY, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Corrine COFFMAN,
Defendant–Appellant.

Nos. 89–5042, 89–5132.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1990.

Decided April 5, 1990.

Jerald Elton Jones, Jones, Williams, West & Jones, Clarksburg, W.Va., Stephen Godfrey Jory, Elkins, West Virginia, for appellants.

David Earl Godwin, Asst. U.S. Atty., (argued), William A. Kolibash, U.S. Atty., on brief, Clarksburg, W.Va., for appellee.

Before WIDENER, PHILLIPS, and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Guy Buffey and Corrine Coffman appeal their conviction for conspiracy to extort under the Hobbs Act, 18 U.S.C. § 1951, challenging the existence of federal jurisdiction.

I

The case involves an attempt by Buffey and Coffman to extort money from James F. Allen. The underlying facts of the extortion attempt are not in dispute. On October 18, 1986, Coffman, apparently not for the first time, had a sexual encounter with Allen which, unbeknownst to Allen,

Coffman captured on audio tape. Another man, Robert Luchuck, was present during the sexual encounter. The tape came into Buffey's hands. Buffey in turn told an acquaintance, Salvatore Marra, of his possession of the tape. Unbeknownst to Buffey, Marra was acting as an FBI informant. Through informant Marra, FBI Agent J.C. Raffety learned of the tape. Raffety persuaded Marra to meet with Buffey and tape record any discussions they might have relating to criminal activities. On November 10, 1986, Buffey and Marra met and Marra tape recorded Buffey's attempts to solicit Marra to extort money from Allen by use of the audio tape of the sexual encounter. Marra agreed.

In furtherance of what the Government claims to have been an attempt to preserve Marra's status as an informant, Raffety devised and implemented the following scheme. First Raffety telephoned Allen warning him of the possible extortion attempt. Next, pursuant to Raffety's instructions, Marra telephoned Allen to effectuate a staged extortion attempt during which he demanded from Allen $20,000. That same evening, Raffety interviewed Coffman, eliciting from her an admission that she had taped her sexual encounter with Allen to obtain money from him. Coffman, apparently under the impression that Allen had contacted the FBI, went to Buffey and informed him of what she thought to be the case. Shortly after the conclusion of the interview with Coffman, Buffey called Marra to cancel the extortion plan. Consistent with Raffety's plan, the extortion attempt was terminated without an untimely revelation of Marra's status.

Allen was the Chairman of the Board and majority stockholder of the James F. Allen Company ("Company"). The Company engaged in interstate commerce in that it performed construction contracts for the United States Corps of Engineers in various states. At trial, Allen agreed that, due to his advancing years, his position in the Company had become that of a "figurehead," leaving the actual operation of the

Company to his son. However, Allen further testified that, despite his figurehead status, he enjoyed access to the corporate funds. Allen was a wealthy man but he testified that he normally kept only about one to three thousand dollars in his personal accounts. Much of his wealth existed in the form of non-liquid assets, including a property in Bath County, Virginia worth approximately $250,000, a home in Clarksburg, Virginia, about $50,000 in municipal bonds and over 50% of the Company's stock. Allen apparently also enjoyed personal ownership of as much as $50,000 in certificates of deposit.

Coffman and Buffey were convicted under the Hobbs Act for conspiracy to extort money from Allen. Each received a sentence of twelve years. Both now appeal.[1]

## II

■ To obtain a conviction under the Hobbs Act ("Act"), the government must prove

> (1) that the defendant coerced the victim to part with property; (2) that the coercion occurred through the "wrongful use of actual or threatened force, violence or fear or under color of official right"; and (3) that the coercion occurred in such a way as to affect adversely interstate commerce.

*United States v. De Parias*, 805 F.2d 1447, 1450 (11th Cir.1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). Buffey and Coffman were convicted of conspiracy to violate the Act. Thus, the burden upon the government was to prove that the acts that Buffey and Coffman conspired to commit would have satisfied each of the Act's three elements had they been committed. *See United States v. Rosa*, 560 F.2d 149, 153 (3d Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977). Buffey and Coffman do not dispute the government's success in satisfying the Act's first two elements. Instead, they contend that the government failed to

---

**1.** Luchuck, the third person in the room during the sexual encounter, pled guilty to the conspiracy charge and was placed on probation.

prove that the acts they conspired to commit would constitute "coercion [that has] occurred in such a way as to affect adversely interstate commerce." *De Parias,* 805 F.2d at 1450.

## A

The issue we face involves a special, distinct species of the Act's interstate commerce requirement because, as the government must concede, the acts Buffey and Coffman conspired to commit would not have affected interstate commerce directly. The terms of the demand Buffey and Coffman conspired to make related to revelation of Allen's sexual activity, not to the Company's business affairs. *Cf. United States v. Jarabek,* 726 F.2d 889, 900–01 (1st Cir.1984) (jurisdictional element satisfied where failure to comply with extortion demand would have directly affected business contracts of entity in interstate commerce).

■ However, under what has come to be known as the depletion of assets theory, the government may satisfy the Act's jurisdictional predicate indirectly if it can show a reasonable probability that the defendants' actions would have the effect of depleting the assets of an entity engaged in interstate commerce. *United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978). The facts of the present case suggest a subspecies of depletion of assets law in that the depletion of the Company's assets would result, not from a demand placed directly upon the Company, but from the access to the Company's assets that Allen, the victim of the extortion, enjoyed. *See De Parias,* 805 F.2d 1447; *United States v. Carpenter,* 611 F.2d 113 (5th Cir.), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980); *United States v. Johnson,* 516 F.2d 209 (8th Cir.), *cert. denied,* 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975). In addition to recognizing an indirect basis of jurisdiction, the cases also establish that the "jurisdictional predicate may be satisfied though the impact upon commerce is small, and it may be shown by proof of probabilities without evidence that any particular commercial movements were affected." *United States v. Brantley,* 777

F.2d 159, 162 (4th Cir.1985), *cert. denied,* 479 U.S. 822, 107 S.Ct. 89, 90, 93 L.Ed.2d 42 (1986).

The looseness with which courts have applied the interstate commerce element, finding the element satisfied even where the effect on interstate commerce is indirect, minimal and less than certain, reflects the Act's "purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery, or physical violence." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). However, broadly as the extension of the interstate commerce requirement has spread, we are still a federal, not a unitary, government and, to satisfy the Act, the government still must show that an effect on interstate commerce is reasonably probable. As one court has stated the matter in the course of finding that the jurisdictional predicate was not satisfied:

> In each case, ... a nexus has been required between the extortionate conduct and interstate commerce in order to establish federal jurisdiction. That nexus may be *de minimis,* but it must nonetheless exist. Additionally, the connection with or effect on interstate commerce must have been at least a realistic probability at the time of the extortion.

*Elders,* 569 F.2d at 1023–24 (citations omitted). *See United States v. Mattson,* 671 F.2d 1020, 1025 (7th Cir.1982) (reversing conviction for lack of federal jurisdiction even under a depletion of assets theory); *see also Brantley,* 777 F.2d at 162 (there is "nothing in [the case law] to suggest that the necessary commercial connection may be shown by producing a child of fantasy"). Accordingly, conviction of Buffey and Coffman would have been proper only if there was a reasonable probability that Allen would have tapped into the Company's assets to satisfy the extortion demand that Buffey and Coffman conspired to make.

## B

■ We begin our factual analysis by noting that, as the government concedes, Allen was a wealthy man. For two rea-

sons, we infer from Allen's wealth that it is highly unlikely that Allen would have satisfied an extortion demand by means of the Company's assets rather than his personal assets. First, the intended extortion demand was based on the threat of revelation of a somewhat indiscreet sexual activity that Allen presumably would not want revealed. Although it is true that Allen had access to the Company's assets, his son ran the Company and it is probable to the point of virtual certainty that Allen would eventually be forced to explain for what purpose he had withdrawn money from the Company. It is much more likely that Allen would have resorted to his readily available personal assets to satisfy any extortion demand. In such a way, the case before us differs from those involving abductions or other scenarios in which the success of the extortion attempt is not predicated on revelation of embarrassing information about the victim of the extortion. See De Parias (kidnapping of son of president of construction company); Carpenter (kidnapping of son of bank officers); Johnson (abduction of wife of bank president). Here, unlike in the abduction cases, concerns for embarrassment would dissuade the personally wealthy extortion victim whose own assets abundantly sufficed from resorting to the assets of the entity in interstate commerce, given the unwelcome publicity attendant upon such a resort.

Second, the amount of money the defendants conspired to extort in the present case is considerably less than the amounts demanded in many of the cases in which courts have found the jurisdictional predicate to be satisfied. See De Parias (ransom demand of $1,000,000); Johnson (ransom demand of $400,000). But cf. Carpenter (ransom demand of $38,000). Therefore, Allen would have had less of a need to rely upon the Company's assets. Indeed, the twenty thousand dollars involved in the extortion attempt here is considerably less than Allen's net worth, indicating that Allen would not have needed to access the Company's assets, particularly with the attendant embarrassment noted above.

The government counters that, although Allen is a wealthy man, he has few liquid assets available to satisfy an extortion demand. The government notes that much of Allen's wealth exists in the form of real estate holdings and the like. First, however, the certificates of deposit to which Allen presumably had easy access would have satisfied the demand the defendants conspired to make. But even aside from these assets, we rely on the fact that, when pressed at oral argument, the government could offer no convincing explanation as to why Allen could not easily secure a loan against his ample non-liquid assets. Because of the likely ease with which he could so secure money to pay off a potential extortion demand, our conclusion that resort to the Company's assets was unlikely remains undisturbed.

Finally, we note that our conclusion is by no means inconsistent with our holding in Brantley. In that case, an FBI undercover agent proposed an arrangement to a local sheriff under which the sheriff would allow the undercover agent to operate an illegal gambling operation in exchange for payments of $500 per month. The undercover agent had informed the sheriff that the gambling operation would attract people from various distant states. After securing the sheriff's agreement, the undercover agent established a bogus gambling operation, bringing in FBI-owned gambling equipment from another state and FBI undercover agents who gambled on the premises with FBI-supplied money. So far as the conspiracy was concerned, the involvement in interstate commerce was deemed present, so the jurisdictional requirement was met. The defendants were convicted under the Hobbs Act for both extortion and for conspiracy to extort.

However, in Brantley we reversed the conviction for extortion. We held that the Act's jurisdictional predicate was not satisfied because there was no actual affect on interstate commerce. True, the gambling equipment came from another state as did, we speculated, some of the undercover FBI agents. However, we held that the absence of a non-fabricated effect on interstate commerce rendered improper the con-

viction of the sheriff and his accomplice for extortion.

We affirmed, however, the conviction for conspiracy to extort. We rejected the argument that the fact that there could be no real effect on interstate commerce meant that an element of the conspiracy offense was not proven. We recited hornbook law when we wrote:

> Upon a charge of a conspiracy or an attempt to violate the Hobbs Act, it is simply irrelevant that, because of facts unknown to the conspirators or to the actor, an actual effect upon commerce was impossible.

> This is consistent with the general rule applicable to inchoate offenses. Though the circumstances may be misapprehended, if one "purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be," the actor is guilty of a criminal attempt. Model Penal Code, § 5.01(1)(a). The same principle is applicable when two or more persons conspire to engage in the conduct. The facts may be taken to be as the conspirators believed them to be.

777 F.2d at 164. Having stated the governing law, we then relied on the critical fact that the conspirators thought that the gambling operation would attract people from various states. If the facts were as the defendants believed them to be, interstate commerce clearly would have been affected and the conviction of the defendants for conspiracy to violate the Act was proper.

■ The crucial and controlling difference between *Brantley* and the present case is that the acts that the *Brantley* defendants intended to commit would affect interstate commerce, whereas the acts that Buffey and Coffman intended to commit would not affect interstate commerce. The *Brantley* defendants intended to receive money in exchange for permission to conduct a gambling operation that the defendants thought would attract gamblers from other states. Attracting gamblers from other states affects interstate commerce. Buffey and Coffman intended to extort money from Allen personally. Extorting money to be devoted to personal use from an individual does not affect interstate commerce.

Out of context, our statement in *Brantley* that "it is simply irrelevant that ... an actual effect upon interstate commerce was impossible," could be read to mean that the government need not show that the defendants' actions were likely to have an effect on interstate commerce. Whether the intent to engage in acts of interstate commerce would be fulfillable or not, if in fact it appeared that the defendants might reasonably probably so think, would not matter. But where, as here, such a reasonable probability has not been shown, the jurisdictional requirement has not been satisfied. Otherwise, we would be deciding in a way which would misconceive *Brantley*'s holding and, in the process, eviscerate the well-established jurisdictional predicate by overruling all of the cases which have held that the government must show that the defendants' actions were reasonably likely to have an effect on interstate commerce. In context, our comments in *Brantley* stand for the limited and familiar proposition that when a defendant facing prosecution for an inchoate crime has conspired to commit acts that would be illegal if the facts were as he believed them to be, he can find no shelter in his misperception of reality. In no way did the holding reduce (or even address) the government's obligation to show that what the defendant intended to do was illegal under the Act and the government has failed to provide such a showing here.[2] The defendants con-

---

2. If, in contradiction of the facts established, Allen could be expected, upon the extortion attempts, to resort to the Company's assets to pay the extortion demand, the case would be quite different and *Brantley* would apply. Then, because the FBI learned of the extortion attempt before it came to fruition, one could reasonably conclude that, even if Allen otherwise would have had to access the Company's assets, a direct effect on interstate commerce was impossible; the FBI never would have allowed Allen actually to pay the extortioners. Such a fact would be of no use to the defendants, however, because, on that assumption, as far as they knew (though in point of fact erroneously), Allen would have paid the extorted money and

 

spired to extort money from Allen and the government has not shown that such an extortion as the defendants intended would have been reasonably likely to have an effect on interstate commerce.[3]

## C

The question of whether a defendant's acts satisfy the jurisdictional predicate of the Hobbs Act is one of law. *See United States v. Kuta,* 518 F.2d 947, 951–52 (7th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Augello,* 451 F.2d 1167, 1170 (2d Cir. 1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972); *Hulahan v. United States,* 214 F.2d 441, 445–46 (8th Cir.), *cert. denied,* 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954). Of course, the jury has much input on the resolution of the issue because the jury determines which facts are true. However, in a case such as the present one, where the evidence introduced by the government, even if believed by the jury, would not satisfy the jurisdictional predicate, the defendant is entitled to a judgment of acquittal. Thus, because, even believing all of the underlying facts presented by the government, we cannot say that it is reasonably probable that the extortion Buffey and Coffman conspired to commit would have had an impact on interstate commerce, the defendants' conviction cannot stand. The sordid little story revealed by the case before us simply has not been shown at all to have an interstate

component. The conviction of the defendants is accordingly

REVERSED.

---

thereby have affected interstate commerce. On the facts, however, Buffey and Coffman have argued merely that what they intended to do, even if it had been possible, would not have violated the Hobbs Act.

**3.** It is a point of some pertinence that there was no showing that the defendants intended to tap into the Company's assets. We recognize that it is the law of this and other circuits that "it is of no moment whether the defendants intended or contemplated an effect on commerce," provided the government can prove "a reasonably probable effect on commerce." *United States v. Spagnolo,* 546 F.2d 1117, 1119 (4th Cir.1976), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977). *See also De Parias,* 805 F.2d at

1450 ("[T]he government need not prove that the kidnappers acted with the specific intent to affect interstate commerce. Instead, the government need prove only that their actions were likely to cause an entity engaged in interstate commerce to pay the ransom."). However, courts have relied, in part, on the presence of specific intent to reach the assets of the entity in interstate commerce to find satisfaction of the jurisdictional requirement. *See, e.g., Carpenter,* 611 F.2d at 114; *Johnson,* 516 F.2d at 214. We simply note that to the extent indications of a defendant's intent to reach the assets of the entity in interstate commerce are at all relevant to our inquiry, such indications are absent from this case.