UNITED STATES of America,
Plaintiff–Appellee,

v.

John L. PASCUCCI, Defendant–
Appellant.

No. 90–10388.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1991.

Decided Aug. 23, 1991.

Harley Kurlander, Tucson, Ariz., for defendant-appellant.

Jon R. Cooper, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before HUG, POOLE and FERGUSON, Circuit Judges.

HUG, Circuit Judge:

John L. Pascucci appeals his conviction following a jury trial for attempted extortion affecting interstate commerce, in violation of 18 U.S.C. § 1951(a) (attempted extortion charge), and transmitting in interstate commerce a communication threatening to injure the reputation of another, in violation of 18 U.S.C. § 875(d) (threat to reputation charge). He contends that, with respect to the attempted extortion charge, there was insufficient evidence to establish an effect on interstate commerce. He further contends that, with respect to the threat to reputation charge, there was in-

sufficient evidence to establish that a threat was made. Pascucci also challenges the sentence imposed upon him by the district court under the Sentencing Guidelines. He argues that the district court erred when it (1) increased his offense level based on an abuse of trust, (2) increased his offense level based upon an obstruction of justice, and (3) departed upward from the Guidelines and doubled the maximum sentence for his offense level. We affirm Pascucci's convictions and sentence in all respects.

I.

On July 26, 1989, John L. Pascucci, along with codefendant Kelly Jo Murphy, was indicted by a federal grand jury for conspiracy to commit an extortion affecting interstate commerce, in violation of 18 U.S.C. § 1951(a) (Hobbs Act Conspiracy) (Count 1), and an attempted extortion affecting interstate commerce, in violation of 18 U.S.C. § 1951(a) (Hobbs Act). On December 13, 1989, a superseding indictment was filed, adding a third count, transmitting in interstate commerce a communication threatening to injure the reputation of another, in violation of 18 U.S.C. § 875(d).

Pascucci's jury trial commenced on March 26, 1990, at which time the following evidence was introduced:

On June 23, 1988, Stephen Gieck, a 28–year–old married businessman from Overland Park, Kansas, was in Peoria, Illinois. Gieck was on a business trip for his employer, Ford/New Holland, a subsidiary of Ford Motor Company. Gieck's responsibility as the dealer placement representative was to travel the five-state area of Kansas, Missouri, Nebraska, Iowa, and Illinois.

While in Peoria, Gieck met a woman calling herself "Lisa" and purporting to be a stewardess. Gieck and Lisa met in a hotel bar and went to Lisa's apartment in Peoria where they engaged in numerous sexual acts. Gieck testified that he gave Lisa very little biographical information about himself; only that his name was Steve and that he worked for Ford Motor Company in marketing. He testified that he did not tell

Lisa his last name and did not mention his wife's name. Gieck also testified that when he left Lisa's apartment that night she pleaded with him to stay but expressed no anger over anything that happened at that time.

Lisa was later identified as Kelly Murphy, a Deputy United States Marshal who worked in Peoria, Illinois. Unbeknownst to Gieck, most of the encounter between him and Murphy was tape recorded, including the conversation in the bar, the conversation during the ride to Murphy's apartment and during the sexual encounter.

In late March 1989, an investigation was initiated by the Olathe, Kansas Police Department after they were informed by Gieck that he had been receiving harassing telephone calls from an individual named "Tony" since July 22, 1988. "Tony" was later identified as the defendant-appellant John Pascucci, then a chief inspector of the United States Marshal's Service at its headquarters in Washington, D.C. Altogether approximately 13 to 18 telephone calls were received at Gieck's home and office pertaining to the one-night affair that he had with Murphy.

During one of the first telephone calls Gieck received from "Tony," Murphy was also on the telephone. At that time, they were asking only for an apology from Gieck for coming in and out of Murphy's life so quickly, as well as for his alleged performing of unpermitted sex acts on her that evening.

Gieck eventually changed to an unlisted telephone number. He also moved to Olathe, Kansas, in order to avoid having a listed address. He testified that "Tony" initially did not ask for any money, but he did indicate that an audio tape and/or pictures might be sent to his wife and employer if he continued to avoid the telephone calls. On March 13, 1989, Gieck's wife received a package containing an audio tape of the encounter between Gieck and Murphy along with a letter stating that Gieck had been unfaithful and requesting their new phone number.[1] At trial, Pascucci admitted to sending this package. Gieck and his wife listened to the first portion of the tape together. It was at this point that they decided to go to the authorities.

An undercover officer, Detective Roger LaRue, acted as a friend of the victim's for the purpose of negotiating with "Tony." After several tape recorded conversations with the Detective LaRue, "Tony" asserted that the matter could be taken care of if he were paid $5,000. The undercover officer had several additional conversations with "Tony" who was in Tucson, Arizona, at the same time; and it was arranged that a package, addressed to "P." would contain $5,000 and would be sent to him at the Sheraton El Conquistador Hotel.

FBI agents in Tucson, Arizona, were contacted by Detective LaRue. It was arranged that agents would set up a surveillance at the hotel. The agents had a description of the package, and at approximately 9:30 a.m. on June 30, 1989, a United States Parcel Service (UPS) truck arrived at the hotel. The UPS worker unloaded several packages, including one that was identified as being the package addressed to "P". Pascucci was observed speaking to the driver as they approached the hotel entrance. The UPS driver took the package to the concierge's desk inside the hotel

---

1. The letter stated:

My name is Tony and I'm a private investigator in the San Francisco Bay area. I was hired by a client in a divorce action and while conducting my investigation, I came into contact with your husband, Steve. Steve has had an affair with my client's wife and numerous other one-night stands during his travels for Ford. The enclosed tape will clearly demonstrate his blatant infidelity. I am afraid that Steve's exploits are somewhat common knowledge among his coworkers. This has, unfortunately, made a fool of you.

This liaison between my client's wife and your husband will result in a divorce trial with your husband named as a defendant. Regrettably, this will not only add to your embarrassment, but become a financial burden as well.

I have taken it upon myself not to send the photographs that go with the tape recording. If you wish to speak to me, or obtain more information about this matter, please leave a phone number with the receptionist at Steve's office. I no longer have your number. Steve changed it and made it unlisted in the hope of avoiding this unpleasant situation.

Sincerely, Tony.

lobby while Pascucci walked to the hotel cashier. At that time, a man, later identified as working for the United States Marshal's Service picked up the package from the concierge's desk and gave it to Pascucci. Pascucci was arrested outside the hotel with the package in his possession.

On March 30, 1990, the jury delivered a verdict of guilty as to the Hobbs Act extortion charge and the threat to reputation charge. However, the jury found Pascucci not guilty as to the conspiracy charge. A separate jury acquitted codefendant Murphy on all counts.

On July 13, 1990, the district court sentenced Pascucci to a term of three years for the attempted extortion charge, a concurrent sentence of one year for the threat to reputation charge, and a period of supervised release of three years to commence upon Pascucci's release from confinement. Pascucci timely appeals.

## II.

### ATTEMPTED EXTORTION

Pascucci contends that there was insufficient evidence to establish a nexus between the extortionate act and interstate commerce. We review the evidence in a light most favorable to the Government to determine whether the jury could reasonably have found extortion. *See United States v. Greger*, 716 F.2d 1275, 1278 (9th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

The statutory language of the Hobbs Act[2] displays a purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). Consistent with this approach, this court

has held that an effect on interstate commerce is established by proof of an actual impact, however small, or in the absence of actual impact, by proof of a probable or potential impact. *See United States v. Zemek*, 634 F.2d 1159, 1173 n. 20 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978). "Only a *de minimus* effect is necessary ... and the effect [on commerce] need only be probable or potential, not actual." *Phillips*, 577 F.2d at 501 (citations omitted). "It is enough that the scheme, if successful, would have affected commerce." *United States v. Rushdan*, 870 F.2d 1509, 1512 (9th Cir.1989) (citations and internal quotations omitted).

The principles expressed in these authorities lead us to conclude that the Government has shown a sufficient nexus to interstate commerce to support a conviction under 18 U.S.C. § 1951 in this case. By showing that the defendant made a credible threat to deliver embarrassing materials *directly* to the victim's employer, who was then engaged in interstate commerce, the Government demonstrated that Pascucci introduced a potential impact on interstate commerce.

Undoubtedly, there would have been an effect on interstate commerce if Pascucci had carried out his threat. Gieck's employer was engaged in interstate commerce and Pascucci threatened to deliver the tapes directly to the company. The delivery of the tape would have had the requisite effect on interstate commerce. *See, e.g., Phillips*, 577 F.2d at 501. Here, however, Pascucci's plan was ruined when he was caught. This fact, however, does not absolve Pascucci of liability. As we stated earlier, the Government need not prove

---

2. 18 U.S.C. § 1951 reads in pertinent part:
  (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined no more than $10,000 or

imprisoned not more than twenty years, or both.
  (b) As used in this section—
    ....
    (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

that Pascucci was successful in his scheme, *see Rushdan,* 870 F.2d at 1512, i.e., the Government need not show that Pascucci was successful in either delivering the tape to Gieck's employer or receiving the money. Such a requirement would not only be inconsistent with the principle that the actor need not be successful, but would also ignore the fact that Pascucci was charged with *attempted* extortion, rather than committing the extortionate act. We therefore conclude that the evidence of Pascucci's threat to deliver the tape to Gieck's employer was sufficient to sustain his conviction.

### III.

■ Pascucci contends that the Government failed to offer evidence sufficient to sustain his conviction for the threat to reputation charge because there was no evidence that Pascucci threatened to injure Gieck's reputation.

■ The transmittal of a threat in interstate commerce is an integral element of federal extortion. *See United States v. Korab,* 893 F.2d 212, 215 (9th Cir.1989). The charged communication under 18 U.S.C. § 875(b) must contain threats directed toward the victim. *Id.*

At issue in this case is a telephone conversation which took place on June 27, 1989. Pascucci asserts that the telephone conversation between Pascucci and LaRue concerned only payment arrangements and reassurances. If so, such conversation was insufficient to form the basis of a violation of 18 U.S.C. § 875(b). The text of the conversation between Pascucci and the detective is somewhat ambiguous.[3] However, we have held that especially when ambiguous, the existence of a threat depends on the circumstances, which the jury interprets. *See United States v. DeLuca,* 692 F.2d 1277, 1283 (9th Cir.1982) (applying standard to extortion charge). The same rule is appropriate here. The jury heard the tapes and were convinced that Pascucci intended to threaten Gieck. By indicating that, "I'm not gettin' a whole lot outta this. I can go either way, so ... you know what I'm saying'?," it appears that Pascucci was implicitly threatening to "go the [other] way" by turning the tapes over to someone else if the payment was not made. There is also evidence that Pascucci applied pres-

---

**3.** The recording of the conversation contained the following dialogue between Pascucci (using the name "Tony") and Detective La Rue:

LaRue: Okay. I think he's more than willing to work out, you know, whatever he can work out. His big thing when I talked to him the other day is knowing that it's a straight up deal ... uh....
Tony: Yeah, I knew that would come out. Well, I'm sure he watches too much TV. Listen, this is not that ... this phone will never ring again. And I think what I need is more or less for you to understand that. I don't care what he understands, he's just a kid. Uh, like I say, uh, I'm not gettin' a whole lot outta this. I can go either way, so ... you know what I'm saying'?
LaRue: Uh huh.
Tony: This is not going to be a reoccurring thing if that's what you're getting at.
LaRue: Well, he wanted to know that the negatives would be there, there wasn't gonna be another bite somewhere down the line.
Tony: No, that's ... and that's and again that's the best he's gonna have to accept that. And I can understand him havin' some concerns about it, but first off, what we're talkin' about is not enough to be worried about, you know what I'm sayin'? It's just more or less coverin' expenses to help him out. And one of the reasons I wanta help him out is cause

I'm tired of this thing, it drags on too long. Part of the reason it drags on too long is he was a little dopey about it and I wish he would a had you to talk to early on in this. We never would a got to stage one, which, believe it or not, would a made me happy. You know, if it never would a got to his old lady, I would a been tickled to death, to be honest with you.
LaRue: Uh huh,
Tony: So ... guess what, this is not what you're implying. This is ... if he's looking for some help, I can help him, that's what I need to help him. And that's it. So ... I thought we already made a decision, so ... these people jerk me around as much as them, but I need them. I also ... whatever ... so ... I guess you're gonna have to decide whether or not you trust me or feel that I'm a reliable contractor.
LaRue: Okay. No chance of a face to face, he hands you the stuff, you give him....
Tony: No, that's not gonna work because I have to, and you know, we talked about it once before. It's gonna ... it's not gonna exist.
Roger: Okay.
Tony: It's not gonna exist any more.
Roger: How can he get it to you?

sure by reminding Gieck of what happened the last time he did not assent to Pascucci's request. Specifically, Pascucci stated, "You know, if it never would'a got to his old lady, I would'a been tickled to death, to be honest with you." The jury reasonably concluded that an implicit threat can be inferred from Pascucci's statements. Additionally, the tone of Pascucci's voice and other nuances were all evidence properly considered by the jury. Accordingly, viewing the evidence in the light most favorable to the Government, we conclude that a jury could reasonably have found Pascucci guilty beyond a reasonable doubt.

## IV.

■ Pascucci contends the district court erred by increasing his offense level based on abuse of trust within the meaning of the United States Sentencing Guidelines (Guidelines) § 3B1.3.

■ Section 3B1.3 of the Sentencing Guidelines mandates a two-level upward adjustment of a defendant's base level "[i]f the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. *See also United States v. Hill,* 915 F.2d 502, 506 (9th Cir.1990). "The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." U.S.S.G. § 3B1.3, Application Note 1. The primary trait that distinguishes a person in a position of trust is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Hill,* 915 F.2d at 506.

The district court's determination that Pascucci's crime involved an abuse of trust and the use of special skills is supported by the evidence. Gieck testified that Pascucci bragged that he had friends who "could get [his telephone] number even though it was unlisted." Moreover, as discussed above, Gieck gave only his first name to

Murphy, stated that he worked for Ford Motor Company and never mentioned his wife's name. Nevertheless, Pascucci was able to track down Gieck to his specific place of employment, a subsidiary of Ford, and send the extortion package to his wife using her formal name, Karen, to an address to which they had moved. There is therefore sufficient evidence supporting the conclusion that: (1) Pascucci used his U.S. Marshal Service identification to obtain Gieck's address and phone number from the hotel; and (2) he found Geick's new address and his wife's name through his contacts as U.S. Marshal. Accordingly, the district court's conclusion that there was sufficient evidence to support a two-point upward adjustment based on abuse of trust or special skills was not erroneous.

## V.

■ Pascucci contends the upward adjustment based on obstruction of justice was improperly assessed.

The district court's finding that Pascucci obstructed justice is a factual conclusion that this court reviews for clear error. *See United States v. Rodriquez–Macias,* 914 F.2d 1204, 1205 (9th Cir.1990). The Guidelines mandate a two-level upward adjustment in a defendant's base offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." U.S.S.G. § 3C1.1. *See also United States v. Lofton,* 905 F.2d 1315, 1316 (9th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990).

The presentence report recommended an upward adjustment of 2 levels for obstruction of justice based on letters received by Murphy, her family, friends, and/or others after Pascucci discovered that Murphy had given a statement to the FBI on September 1, 1989. The district court concluded that not all the letters could be attributed to Pascucci,[4] but that certain letters clearly

---

**4.** The district court made the following findings:

I think the combination of the letter to the mother with the green handwritten note that

constituted a threat to Murphy. Pascucci raises several arguments with respect to the district court's determination that Pascucci threatened Murphy.

Pascucci first argues that the green handwritten letter was sent to Kelly's mother and that the Guidelines do not contemplate an upward adjustment for threats to a witness's mother, only the witness herself. Even if Pascucci's strained reading of this Guidelines provision was accurate, the evidence at the sentencing hearing was that the letter, although it was addressed to Murphy's mother, was contained in a second envelope bearing Kelly Murphy's name. Even though the letter was not *addressed* to Kelly, it is clear that it was intended to be delivered to her.

Pascucci next argues that because he never obtained a copy of the letter, he could not respond to it and was therefore deprived of due process. However, it was defense counsel that elicited the testimony that the letter was sent and received. Under these circumstances, the district court was not precluded from relying on Murphy's answer.

Finally, Pascucci argues that there is no evidence that he was responsible for the threats. However, Murphy testified that the letter was in Pascucci's handwriting. Further, the Government has submitted an affidavit which circumstantially indicates Pascucci was the author of the letters as well as the "muffled voice caller" who

made similar threats to Murphy and her relatives. Under these circumstances, we conclude that the district court's finding of obstruction of evidence was not clearly erroneous. *See United States v. Foreman,* 926 F.2d 792, 794–955 (9th Cir.1990).

## VI.

■ Pascucci contends that the district court erred by departing upward from the Guidelines and doubling the maximum sentence for his offense level under § 5K2.0.[5] An en banc panel of this court has recently addressed our standard for reviewing a district court's upward departure from the Guidelines. *See United States v. Lira–Barraza,* 941 F.2d 745 (9th Cir.1991) (en banc). We first consider whether the district court had the authority to depart. Second, we review for clear error whether the factual findings supporting the existence of the identified circumstance. Third, we determine whether the extent of the departure was "unreasonable."

■ Here, Pascucci challenges the district court's authority to depart as well as the extent of the departure. The district court gave two reasons for the departure. He did so first because Pascucci orchestrated the entire affair even though he was a U.S. Marshal and second because he involved Murphy, his subordinate, in the plot.[6] We are convinced that these factors

was enclosed with all of the laws inside it was clearly a threat.
I am not going to pay any attention to the herpes letter; we don't know who sent that. I think that the calls to Ruthe, demanding that he call Murphy and tell her lies about sexual events on the evening of the banquet fall in that category. . . .

5. The policy statement to § 5K2.0 states in pertinent part:
Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Circumstances that may warrant departure from the guidelines pursuant to this provision

cannot, by their very nature, be comprehensively listed and analyzed in advance. . . . Similarly, the court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines (*e.g.,* as a specific offense characteristic or adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate. U.S.S.G. § 5K2.0, Policy Statement.

6. Specifically, the district judge made the following statement at sentencing:
I am going to make an upward departure, and it's not nearly as much as I was going to do two weeks ago. Talked with Judge Dwyer about this at some length. I'm doing it for two reasons, Mr. Pascucci: In your own words, you choreographed this whole sordid affair when you should have known better, and you didn't.

were not contemplated by the Guidelines. The Guidelines permit departure for circumstances of a kind, *or to a degree,* not adequately taken into consideration by the Sentencing Commission. *See* 18 U.S.C. § 3553(b) (emphasis added). While we agree with Pascucci that the circumstances identified by the district court may be categorized as an abuse of trust, we also conclude that the district court properly determined that the *degree* of trust which Pascucci held coupled with the *degree* of his involvement in this sordid affair warranted a departure in this case. The evidence is clear that Pascucci required a subordinate to perform various sex acts on approximately 10 men while watching, participating, or recording the activity. The Sentencing Commission simply did not contemplate a senior official from the U.S. Marshal Service using his position to promote such activity. Nor can we say that an 18–month departure for this behavior was unreasonable.

The district court's decision to upwardly depart by 18 months in light of Pascucci's offense conduct is

AFFIRMED.

FERGUSON, Circuit Judge, dissenting in part:

It is well-established that the government must prove every element of the offense charged.

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt *of every*

*fact* necessary to constitute the crime with which he is charged.

*Sandstrom v. Montana,* 442 U.S. 510, 520, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39 (1979) (quoting *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)). To attain a conviction under the Hobbs Act, the government must prove three elements:

(1) that the defendant coerced the victim to part with property; (2) that the coercion occurred through the "wrongful use of actual or threatened force, violence or fear or under color of official right"; and (3) that the coercion occurred in such a way as to affect adversely interstate commerce.

*United States v. De Parias,* 805 F.2d 1447, 1450 (11th Cir.1986) (citation omitted), *cert. denied sub nom. Ramirez v. United States,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). Here, the government has failed to present facts necessary to prove the third element, i.e., that interstate commerce was, or would potentially be, affected by Pascucci's extortion scheme. The Supreme Court has emphasized, "[t]he charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960).

Clearly, the Hobbs Act does not make every act of extortion a federal crime, but only those extortions where the blackmail causes an "obstruct[ion], delay[ ] or [e]ffect" on interstate commerce. 18 U.S.C. § 1951(a). I cannot agree with the majority that "the Government has shown a suffi-

You were a major law enforcement officer in this country. You were certainly, while not her direct supervisor, she had worked for you on at least two or three occasions, and you used your office to obviously get her many favors and things of that nature.

You, above all, should never have let her get into this. And I don't consider her Mother Teresa or anything close to it, and she's got plenty to answer for, and I hope to God she never carries a badge or a gun for the rest of her life.

And if the Marshal's Service lets her get away with this, then they deserve everything they get. But, nevertheless, you were the per-

son that should have known better, and didn't.

You've had a distinguished career, and that certainly weighs in the balance. But the fact is that I think you are sick, sir, I think you are really sick, and if I didn't think you were sick, I would bounce this up to five or six years in a big hurry.

But I think your involvement in this is so deep and his whole sordid affair is so bad that the guidelines don't completely take it into effect.

So I'm going to go upward, I'm going to sentence you to 36 months in jail....

cient nexus to interstate commerce to support [Pascucci's] conviction under 18 U.S.C. § 1951." *Supra,* at 1035.

As the majority notes, there is a broad congressional purpose behind the Act.

That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference "in any way or degree."

*Stirone,* 361 U.S. at 215, 80 S.Ct. at 272 (quoting 18 U.S.C. § 1951(a)). However, regardless of the breadth of congressional intent, the Act does not relieve the government of its constitutional requirement to prove every element of the crime charged. "[W]e are still a federal, not a unitary, government and, to satisfy the Act, the government still must show that an effect on interstate commerce is a reasonable probability." *United States v. Buffey,* 899 F.2d 1402 (4th Cir.1990). This is not to say that Pascucci's actions are not probably criminal. However, "[s]tates are presumably competent to prosecute extortion fully contained within the state." *United States v. Korab,* 893 F.2d 212, 213 (9th Cir.1989).

The government's argument in support of jurisdiction over Pascucci's acts has two prongs, both focus on the interstate character of the victim's employer. The first prong is that Gieck's employer, Ford Motor Company, would fire the victim if informed of the extortion scheme and then have to expend its resources in retraining a new employee. The government's second theory is that Gieck would have difficulty performing his job because of the stress inherent in being an extortion victim, thus causing an effect on interstate commerce. These arguments amount to a claim that because Pascucci's victim was employed by a firm engaged in interstate commerce, the jurisdictional nexus is established. There is no case law support for this proposition. "[I]nterstate commerce must be affected *by extortion,* not by a result of extortion." *United States v. Mattson,* 671 F.2d 1020, 1025 (7th Cir.1982) (emphasis in original). "There is nothing in [the case law] to sug-

gest that the necessary commercial connection may be shown by producing a child of fantasy." *United States v. Brantley,* 777 F.2d 159, 162 (4th Cir.1985), *cert. denied,* 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 42 (1986). The defense correctly notes that if this court upholds Hobbs Act jurisdiction based on the facts in this case, then virtually every act of extortion could be prosecuted under the Hobbs Act. Any victim that has a job would probably have his or her job performance affected, almost every employer must train new employees, and the vast majority of employers would be found to have business related to interstate commerce.

Such a broad, unprecedented holding is particularly inappropriate here where the alleged adverse employment repercussions are pure speculation. After citing the rule that the effect on interstate commerce may be only minimal or merely potential, *see, e.g., United States v. Zemek,* 634 F.2d 1159, 1173 n. 20 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981), the majority then leaps to the conclusion that the government introduced evidence sufficient to prove federal jurisdiction. The majority states that if Pascucci had followed through on his threat to deliver the audio tape to Gieck's employer, interstate commerce would have been affected. What is missing is how exactly the knowledge by Ford Motor Company of adultery on the part of one of its employees could, even potentially, affect interstate commerce. Neither the victim's employer nor its agent was ever called to testify. In fact, there was no evidence presented which gave any indication that Ford Motor Company had ever discharged an employee based on marital infidelity.

The jurisdictional nexus here was based simply on Gieck's testimony at trial that the extortion attempt caused him stress because he was worried about how his employer would react if the blackmail became public knowledge. This statement without more is not enough to sustain the government's burden of proving federal jurisdiction. "The government [is] required to prove beyond a reasonable doubt that the natural consequences of the acts alleged in

the indictment would delay, interrupt or otherwise affect interstate commerce." *Mattson*, 671 F.2d at 1025. No such evidence exists in this case.

Because the majority's conclusion is not supported by any precedent in this circuit or any other court, it can only cite to *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978) to support its conclusion. However, in *Phillips*, the extortion scheme involved a payoff to a redevelopment agency to receive settlement of a contracting claim. This court stated, "appellants threatened the depletion of resources from a business engaged in interstate commerce. This has been consistently found an adequate jurisdictional basis." *Id.* (citations omitted).

*Phillips* reflects this court's adoption of the depletion of assets theory as a basis of Hobbs Act jurisdiction. *Id.* at 501. Under this theory, extortion which does not directly focus on interstate commerce may still be prosecuted under the Hobbs Act depending upon the source of the extorted money. This theory requires that the facts of the case demonstrate a likelihood that the victim being extorted will use money from a company involved in interstate commerce to pay the extortion. No such claim was made here.

The Fourth Circuit has considered a case with similar factual circumstances. In *United States v. Buffey*, 899 F.2d 1402 (4th Cir.1990), the defendant was involved in an extortion scheme based on an illicit sexual encounter. The victim was the chairman of the board and majority stockholder of a company involved in interstate commerce. In this position, the victim had easy access to corporate funds. However, the court found that because the victim was a personally wealthy individual, "[i]t is much more likely that [he] would have resorted to his readily available personal assets to satisfy any extortion demand." *Id.* at 1405. Because the government could not show that the victim would actually use corporate funds instead of his own personal money, the court reversed the Hobbs Act conviction. The court concluded that "in a

case such as the present one, where the evidence introduced by the government, even if believed by the jury, would not satisfy the jurisdictional predicate, the defendant is entitled to a judgment of acquittal." *Id.* at 1407.

As the Seventh Circuit has warned, "[i]f a sufficient nexus were found here, [I am] unable to conceive of an extortionate transaction which would not be punishable under the Hobbs Act." *Mattson*, 671 F.2d at 1025. Therefore, I would reverse Pascucci's Hobbs Act conviction for lack of federal jurisdiction.

I concur in the remainder of the majority opinion.