**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ludmilian BENGALI, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ventzislav G. KOUTEV, Defendant–
Appellant.**

Nos. 92–5891, 93–5016.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 27, 1993.

Decided Dec. 17, 1993.

---

Thomas Crane Carter, Carter, Kramer & Ragland, P.C., Alexandria, VA, for defendant-appellant. Koutev.

David Scott Bracken, Law Offices of John T. Donelan, Alexandria, VA, for defendant-appellant Bengali.

John Patrick Rowley, III, Asst. U.S. Atty., Alexandria, VA, argued (Kenneth E. Melson, U.S. Atty., on brief), for plaintiff-appellee.

Before MURNAGHAN, Circuit Judge, CHAPMAN, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

CHAPMAN, Senior Circuit Judge:

These appeals are from convictions and sentences for conspiracy to commit extortion, three substantive acts of extortion and attempted extortion under the Hobbs Act, 18 U.S.C. § 1951, and one count of unlawful travel in interstate commerce to promote the extortion scheme in violation of 18 U.S.C. § 1952(a)(3). Ludmilian Bengali was convicted on all counts, and Ventzislav Koutev was convicted of all counts, except interstate travel, for which he was not charged.

Appellants claim that there were errors in their trials and sentences because (1) the jurisdictional predicate of a Hobbs Act prosecution was not met, there being no proof that defendants' activities affected or had the potential of affecting interstate or foreign commerce; (2) the evidence was not sufficient to sustain Koutev's conspiracy conviction; (3) the trial court abused its discretion in admitting evidence of·other crimes; (4) the trial court erred in enhancing the sentences by finding that the victim was "vulnerable" under U.S.S.G. § 3A1.1; and (5) the trial court erred in enhancing Bengali's sentence under U.S.S.G. § 3B1.1 by finding that he was an organizer or leader of the criminal activity.

We find no merit to any of these exceptions, and we affirm.

## I.

Tosho Nedialkov, together with his ·wife and twin daughters, moved to the United States from Bulgaria in September 1991. He is a businessman who became financially successful working as an independent financial and marketing consultant following the fall of the Communist government in Bulgaria. He worked as an international consultant for Bulgarian clients from an office in his McLean, Virginia home. He also served as president of the Young Astronauts International Foundation, a nonprofit corporation which promotes international education programs in the fields of mathematics, physics, and fundamental sciences using space exploration related subjects. Prior to moving to this country, he had made only two short visits to the United States and was unfamiliar with American society and customs. Neither Nedialkov nor his wife had ever lived outside Bulgaria until they moved to the United States.

In February 1992, Nedialkov and his family took a three-month business trip to Bulgaria. Nedialkov returned to McLean, Virginia on April 26, 1992. His wife and daughters returned to the United States one week later. Upon returning to his home in McLean, Nedialkov found the telephone wires to his house had been cut and his home security system was not functioning. He was uneasy about this development and the following day he received a telephone call from a man, who identified himself as .Giovanni, who advised him that he was a member of a powerful Italian family and had some important news for Nedialkov. They agreed to meet three days later.

The following day, Nedialkov received a call from a man identifying himself as Valio who requested a meeting. The two men met the same day at the Crystal City Marriott at ·Crystal City, Virginia, at which time Valio told Nedialkov of the existence of a Bulgarian organization in New York which was determined to kill Bulgarian immigrants whom the organization believed had stolen money or property from the Communist government of Bulgaria. Valio advised that the organization had planned to murder Nedialkov and his family and that the organization had contacted members of Russian and Italian organized crime syndicates and put out a contract to kill .Nedialkov and his family.

Nedialkov told Valio that he had been contacted previously by Giovanni and Valio advised that Nedialkov should pay whatever price Giovanni demanded to protect himself and his family. Valio also advised that these people were professionals and that Nedialkov should not play games with them.

Following this meeting, Nedialkov was so frightened that he did not return home and slept in his automobile at the Falls Church · Metro Station parking lot. The next day he met Giovanni at the Willard Hotel and was advised by Giovanni that he represented a powerful Italian family which had been contacted by the Bulgarian organization desiring to have Nedialkov and his family killed. Giovanni said that his family had declined the murder contract and that he had been sent to offer Nedialkov protection for a price. Giovanni stated that the Bulgarian organization offered $50,000 to have Nedialkov killed and that the family would protect him for about $60,000, that figure being approximately ten percent of what the family figured his businesses in the United States were worth.

Giovanni also stated that it would cost an additional $20,000 to stop a plot of the Bulgarians to have Nedialkov arrested on drug charges. He warned that cocaine had been

placed in the chimney of Nedialkov's home and that the Bulgarians had informed the Drug Enforcement Administration of the illegal drugs. Giovanni told Nedialkov that since he knew no one in this country there would be no way to explain his possession of the drugs in the chimney. Giovanni said he could stop the drug raid if he received $20,000 by 5:00 p.m. that day. Giovanni also advised Nedialkov that he was "a dead man" if he told police about the meeting. It was agreed that Nedialkov would pay Giovanni $80,000.

In order to make payment, the two men went to The Business Bank in Vienna, Virginia where Nedialkov maintained an account. This was a joint account with his wife, used for both his business ventures and personal expenses. Due to banking regulations, The Business Bank would not allow Nedialkov to withdraw more than $2,000 in cash. This amount was withdrawn and paid to Giovanni, who was upset about the small amount. Nedialkov agreed to obtain additional cash the following day. The following day, as a result of transfer of funds between accounts in The Business Bank and the Independence Federal Savings and Loan, Nedialkov collected an additional $18,000 in cash and took it to his home. The men had discussed earlier that Giovanni would pick up the money that evening. After returning home, he received a call from Valio who explained how dangerous the situation had become. At approximately 9:00 p.m., Giovanni arrived by taxi at Nedialkov's house and was paid $18,000. Nedialkov testified he paid the money to protect himself and his family from a danger he did not understand but which Giovanni and Valio said existed.

The day after Nedialkov's wife and daughters returned to the United States, Giovanni called and asked for a meeting. Nedialkov took his wife to a meeting at Crystal Gateway Marriott and Giovanni repeated his story about the Bulgarian organization and the danger to the Nedialkov family. He insisted that the remaining $60,000 be paid in two parts, $55,000 by cashier's check and at least $5,000 in cash. He stated he would pick up the cashier's check by 9:00 a.m. on May 7. At the appointed time, Giovanni arrived at Nedialkov's home in a new green Mercedes Benz 300E. Nedialkov and his wife drove to The Business Bank with Giovanni following. At the bank, Giovanni advised that the cashier's check should be made to Ludmilian Bengali. Nedialkov withdrew $55,000 in the form of a cashier's check from his account and gave it to Giovanni, who was later identified as Ludmilian Bengali. The Nedialkovs and Giovanni drove from the bank to a nearby McDonalds where Giovanni told them that he knew their daughters were in school and that if they made one telephone call, they would never see the girls again.

About six weeks later, one of Nedialkov's daughters found a micro cassette tape player in the mailbox of the family home. Inside the tape player was a recorded message from Giovanni demanding an additional $5,000 and stating that someone would be at the home at 10:00 p.m. on Friday, June 26, to pick up this money. Nedialkov consulted with a friend who suggested that he contact the police. This was done and the FBI was brought into the matter. A controlled delivery of the $5,000 was planned for Friday night, June 26. At about 11:30 p.m. on that night, Nedialkov received a telephone call from someone he believed to be Valio, who stated that he was calling for Giovanni and asked if everything was ready. Later Giovanni called and said that his secretary would pick up the package. FBI agents had the neighborhood staked out and observed Koutev (who was identified at trial as Valio) drive by the Nedialkov home in a Toyota. A woman, who was in the car with appellant Koutev, was later identified as Miriam Mable Lara. The officers saw these two individuals get into Koutev's grey Mercedes and come back to the Nedialkov neighborhood. Koutev got out of the car a few houses before the Nedialkov residence. When Lara arrived at the Nedialkov residence, Nedialkov, wearing a body recorder supplied by the FBI, went outside with a package containing the $5,000 and asked Lara if she was Giovanni's secretary. She replied in the affirmative. He then gave her the box containing $5,000 and she handed him a sealed letter. Shortly after leaving the Nedialkov residence, Lara picked up Koutev who was waiting on a side street. The FBI

followed the two and eventually Lara, Koutev and Bengali were all arrested.

At trial, Bengali took the stand and admitted he received the $55,000 from Nedialkov but insisted that the money was for making a telephone, call to Bulgaria which allowed Nedialkov's wife and daughters to leave the country in May 1992. This testimony differed substantially from the statement he had given the FBI at the time of his arrest, when he stated that Nedialkov was a former Bulgarian secret police officer who had unjustly seized Bengali's mother's home in Bulgaria and Nedialkov paid the $55,000 to compensate Bengali for this loss. On cross-examination, Bengali was asked if he had attempted to extort money from a Bulgarian national in the United States named Darina Pavolova. He denied ever meeting Pavolova. On rebuttal, Darina Pavolova testified that she was married to a wealthy Bulgarian businessman and Bengali had called her and requested a meeting. At the meeting, Bengali told her that he was an undercover FBI agent and there were people in the Bulgarian government who were very interested in her husband's money. Bengali offered to help her. He also advised that the Bulgarian mafia, which was powerful and dangerous, operated in the United States and that recently a Bulgarian man had been shot in McLean. She refused to pay him anything.

Bengali and Koutev were convicted and now appeal.

## II.

Appellants argue that the government failed to prove an essential element of a Hobbs Act prosecution, i.e., that the coercion or extortion affected interstate or foreign commerce, and that because the commerce element is the jurisdictional predicate to the prosecution, the federal district courts did not have jurisdiction to try this case.

■ Title 18 U.S.C. § 1951 provides in pertinent part:

(a) Whoever in any way or degree obstructs, delays or affects commerce ... by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) As used in this section—

(2) the term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) the term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

In *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Court stated:

[T]here are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the federal government's jurisdiction of this crime rests only on that interference.

*Id.* at 218, 80 S.Ct. at 273–74. Later in *Stirone,* the court made it clear that the Hobbs Act is not to be narrowly applied. "That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Id.* at 215, 80 S.Ct. at 272.

■ The question of whether a defendant's conduct satisfies the jurisdictional predicate of the Hobbs Act is one of law. On appeal it is a question of whether the evidence introduced by the government satisfies the jurisdictional predicate. *See United States v. Buffey,* 899 F.2d 1402, 1407 (4th Cir.1990).

■ In the present case, the evidence was clear that the defendants' extortion scheme affected interstate and foreign commerce by extorting $75,000 from Nedialkov through the wrongful use of threats of force and fear because these funds were withdrawn from a bank account that was used to conduct his business activities in the United States and in Europe. The bank account was used for his financial, marketing and consulting business in McLean, Virginia and in Bulgaria. The fact that this bank account was also used for his personal living expenses does not change the situation. The depletion of the assets of a business that is engaged in interstate and foreign commerce affects such commerce. In *Buffey*, we approved the "depletion of assets theory" for establishing Hobbs Act jurisdiction. *See* 899 F.2d at 1404. Although the victim of the extortion was Nedialkov, the money he used to pay the extortioners came from a bank account used by a business engaged in interstate and foreign commerce. This was sufficient to establish that an effect on interstate and/or foreign commerce was reasonably probable. *United States v. Brantley,* 777 F.2d 159, 162 (4th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 89, 90, 93 L.Ed.2d 42 (1986).

### III.

■ There is no merit to Koutev's contention that the evidence does not support his conviction on the charge of conspiracy to extort money from Nedialkov in violation of the Hobbs Act. In reviewing a challenge to a criminal conviction in a trial by jury, the verdict must be sustained, if, taking the view most favorable to the government, there was substantial evidence to support it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The evidence against Koutev, as outlined in the beginning of this opinion, is overwhelming. He was involved in the scheme from almost the beginning and obviously was working closely with Bengali to increase the victim's fear of the various organized crime syndicates. He was also present at the end of the conspiracy. He had "cased" Nedialkov's neighborhood and residence and remained in the vicinity at the time of the payment on the evening of June 26. He was also identified as "Valio."

### IV.

■ Appellants challenge the sufficiency of the evidence supporting the court's finding that Nedialkov was a "vulnerable victim" under the United States Sentencing Guidelines. U.S.S.G. 3A1.1 provides:

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

In finding that Nedialkov was a vulnerable victim, the trial judge concluded:

His family came to the United States about six months prior to this offense, and he really was not familiar with U.S. customs, when he finally reported it to the police he was surprised that the police were so supportive of him, and from the country where he came, apparently, corruption is commonplace and this is unfortunately the way of doing business, or so he thought. And so he was surprised he was treated so fairly by the criminal justice system and the law enforcement officers, and he said in an interview with the probation officer had he known the police would have been honest and supportive towards him in their handling of their case, he would have contacted them immediately when approached by the defendants.

So I think his lack of knowledge about the conditions in the U.S. and about the way we do business here and handle crime made him particularly susceptible. So accordingly, I think that's a vulnerable victim.

These are findings of fact by the district court that are protected by the clearly erroneous rule. *United States v. Daughtrey,* 874 F.2d 213 (4th Cir.1989). The evidence certainly supports the findings by the district court and they will not be disturbed.

### V.

■ Bengali appeals the two level increase for his leadership role in the offense as provided by U.S.S.G. § 3B1.1. In making the enhancement, the court found:

I think the rule on the offense to the two level enhancement for Mr. Bengali was appropriate because he did assume a leadership role in this case. He controlled the money prior to his activities. He directed his co-defendants in this case on the night of the arrest, and that he was responsible for creating and executing the scheme, I think the evidence shows that. It's under 3B1.1(c): If defendant was an organizer, leader, manager or supervisor, other than described in 3B1.1(a) or (b), increase by two levels. Here I think that the probation officer, considering his role in the offense, appropriately assessed the two points against him.

It was not clearly erroneous for the court to find from the evidence in this case that Bengali was the organizer and leader of the conspiracy. He made the original contacts with the victim, he made most of the threatening statements, he collected $75,000 and it was not error to find that he also directed the activities of Koutev and Lara.

## VI.

■ There is no merit to the claim that the trial court erred in admitting the testimony of the witness Darina Pavolova. This evidence was clearly admissible under Federal Rule of Evidence 404(b) to prove motive, intent and plan to extort the money. A proper foundation was laid for this evidence during the cross examination of Bengali. Under Rule 404(b), evidence of similar acts is admissible if it is (1) relevant to an issue other than character, (2) necessary and (3) reliable. *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir.1988). The Pavolova evidence met all of these criteria. A decision to admit Rule 404(b) evidence is committed to the discretion of the trial court and will only be disturbed when such admission is found to be arbitrary or irrational. *See United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir.1992). The appellants cannot meet this standard because the evidence was clearly within the ambit and intent of the rule.

*AFFIRMED.*