UNITED STATES of America, Plaintiff,

v.

Kevin Paul WOODRUFF, et al., Defendants.

No. CR–93–0438–VRW.

United States District Court, N.D. California.

Aug. 22, 1996.

As Modified Sept. 3, 1996.

Ephraim Margolin, Law Offices of Ephraim Margolin, San Francisco, CA, for defendants.

Craig J. Jacobsen, U.S. Attorney's Office, San Francisco, CA, for plaintiff.

### ORDER

WALKER, District Judge.

Pending before the court is defendant's FRCrP 29 motion for judgment of acquittal. On May 23, 1996, the court issued a tentative decision granting defendant's motion. The court also invited the parties to submit further memoranda in light of that tentative decision and ordered them to appear for a hearing on July 2, 1996. At that hearing, the government, in addition to addressing the merits of the court's tentative decision, requested leave to file a motion to detain defendant pending appeal of the court's order. Briefing on the government's detention motion was completed August 2, 1996. For the reasons described below, the court now GRANTS defendant's motion for acquittal and GRANTS the government's motion to detain defendant pending appeal.

### I

In *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the United States Supreme Court, for the first time in two generations, struck down an act of Congress as falling outside the outer limit of Congress' power under the Commerce Clause. In so doing, the Court reaffirmed the importance of the dual-sovereign nature of our system of government:

In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.

Id. at ——, 115 S.Ct. at 1638 (Kennedy, J. and O'Connor, J., concurring) (quoting The Federalist No 51, p 323 (J. Madison) (C. Rossiter ed 1961)); see also *Gregory v. Ashcroft,* 501 U.S. 452, 458–59, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. * * * In the tension between federal and state power lies the promise of liberty."); *New York v. United States,* 505 U.S. 144, 181, 112 S.Ct. 2408, 2431, 120 L.Ed.2d 120 (1992) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.") (internal quotation omitted).

In their concurring opinion, Justices Kennedy and O'Connor further reviewed the important motivations underlying protection of these fundamental precepts of federalism:

The theory that two governments accord more liberty than one requires for its realization two distinct and discernible lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If, as Madison expected, the federal and state governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function. 'Federalism serves to assign political responsibility, not to obscure it.' *FTC v. Ticor Title Ins Co,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992). Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political

responsibility would be illusory. The resultant inability to hold either branch of the government answerable to the citizens is far more dangerous even than devolving too much authority to the remote central power.

*Lopez,* —— U.S. at ——, 115 S.Ct. at 1638 (Kennedy, J. and O'Connor, J., concurring) (internal citation omitted).

It is the responsibility of all officers of the government to respect this constitutional design. Id. at ——, 115 S.Ct. at 1639 (citing *Public Citizen v. Department of Justice,* 491 U.S. 440, 466, 109 S.Ct. 2558, 2573, 105 L.Ed.2d 377 (1989)). As it did in *Lopez,* the judiciary must act "when one or the other level of Government has tipped the scales too far," as the "federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for [a court] to admit inability to intervene." Id.

■ It is with these principles in mind that the court reluctantly finds itself compelled to intervene to correct an imbalance in the scales of power. The Hobbs Act, 18 U.S.C. § 1951(a), makes criminal the conduct of anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion * * *." As should be clear from the plain language of this statute, Congress did not intend to reach, nor did it purport to reach, every robbery and extortion. In just the same way, the Framers did not intend that federal authority under the Commerce Clause reach all business transactions and certainly not all non-business activities which affect commerce in some incidental fashion. While the court does not suggest that the Hobbs Act was beyond the authority of Congress to enact, the court concludes that the government's prosecution of this case under the Hobbs Act fails to respect the constitutional limits applicable to the Hobbs Act. Implicit in every prosecution under the Hobbs Act is the government's determination that the conduct of the defendant is the proper subject of federal action. The court believes that this determination under the facts at hand is incorrect.

For the reasons discussed below, the court finds that the government has crossed the line that circumscribes its authority in this case as it has failed to show either that defendant's conduct had a substantial effect on interstate commerce or that defendant's activities were of a class of activities that, in the aggregate, would lead to a substantial effect on commerce.

## II

### A

This case arises out of events occurring between March 1 and March 29, 1991. The government's evidence at trial proved that defendant robbed three jewelry stores and attempted to rob a fourth one. All four stores were located in three counties of northern California.

The first robbery occurred on or about March 1, 1991, when defendant robbed Mark Areias Jewelers in Aptos, California. As a result of the robbery, the store lost approximately $200,000 worth of jewelry and was unable to conduct business for three days. Although the store purchased at least 50% of its inventory from out of state, it served mostly local customers. Nicolle Callahan, a witness for the government, testified that the robbery caused no change in the way the store dealt with out-of-state suppliers and that the store still purchases the same amount of its merchandise from out of state.

On March 12, 1991, defendant robbed Shreve & Co. Jewelers in Walnut Creek, California, resulting in the loss of approximately $300,000 worth of jewelry. The store had to replace the stolen jewelry and was shut down for one day after the robbery. At trial, Peter Fogel, former president of Shreve & Co., testified that at least 90% of the jewelry in the Walnut Creek store came from out of state. Fogel also testified that his company did not reduce its inventory or change its out-of-state buying practices as a result of the robbery. The store's clientele was comprised mainly of local residents. Shreve & Co. operates in California but was at the time owned by a company headquartered in Minneapolis, Minnesota.

On March 29, 1991, defendant attempted to rob Sam Bloch Jewelers in Hayward, California. Although the store did not lose any inventory, it was closed for one or two days and was unable to conduct business during that time. At trial, Nathan Stone, the owner, testified that the store purchased 75%–80% of its jewelry from out of state, but that most of its customers and operations were local.

Defendant, on the same day of the attempted robbery at Sam Bloch, robbed Golden Treasures Jewelers in Montclair, California. The owner of the store, Arthur Oppenheimer, testified that he lost approximately $118,000 in jewelry, 75% of which he had handmade. According to Oppenheimer, Golden Treasures was closed for business for a few days due to the robbery and has still not fully recovered the loss. Oppenheimer testified that, as a result of the robbery, he could not conduct business as usual for quite some time after the robbery because he did not have the necessary parts to manufacture the jewelry sold in his store.

On August 20, 1993, defendant was indicted on four counts of interfering with commerce by robbery under the Hobbs Act, 18 U.S.C. § 1951. During the course of trial, defendant moved for judgment of acquittal pursuant to FRCrP 29. The court reserved decision until after the jury had reached a verdict. On January 29, 1996, the jury convicted the defendant on all four counts. Thereafter, defendant timely renewed his motion for judgment of acquittal contending that the government's evidence was insufficient to sustain a conviction under the Hobbs Act.

### B

The test for determining whether to grant a motion under FRCrP 29 is whether, viewing the evidence in the light most favorable to the government, there was relevant evidence at trial from which the jury could reasonably find the defendant guilty beyond a reasonable doubt. *United States v. Pinkney*, 15 F.3d 825, 826 (9th Cir.1994). If the court reserves decision on a motion for judgment of acquittal, the court must decide the

motion on the basis of the evidence at the time the ruling was reserved. FRCrP 29(b).

## C

■ Defendant's participation in the three robberies and one attempted robbery at bar is not wholly free from doubt. None of the persons in the jewelry stores at the time was able to identify defendant as a participant. Some of them did provide a general description that could match that of defendant, but each admitted uncertainty on the point. The government, therefore, sought to establish the fact of defendant's participation by two lines of evidence. First, the government introduced the testimony of an accomplice who participated in the three robberies and one attempted robbery and told the jury that defendant did, as well. Second, the government produced DNA evidence that linked defendant to a blood sample left on an automobile used in the Sam Bloch attempted robbery and on a glove found near the scene of the Golden Treasures robbery.

After considering this evidence, the jury resolved the doubt about defendant's participation against him. The court does not question the soundness of this conclusion and believes that whatever doubt may exist about defendant's participation, it is not a reasonable one. Rather, the troublesome issue is whether the government proved the nexus between the defendant's actions and interstate commerce necessary to support a conviction under the Hobbs Act.

## D

■ As noted earlier, the Hobbs Act makes criminal the conduct of anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion * * *." Commerce under the Hobbs Act is defined as follows:

> [C]ommerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside of such State; and all other

commerce over which the United States has jurisdiction.

18 U.S.C. § 1951(b)(3). Thus, an essential element of the crime is that the robbery obstruct, delay or affect interstate commerce. Like all other elements of the offense, this jurisdictional element must be proved to the jury beyond a reasonable doubt, *United States v. Nukida,* 8 F.3d 665, 669–73 (9th Cir.1993). As will be discussed more fully below, fashioning and applying this element also presents a question of law for the court, the answer to which may be found, in part, in the constitutional principles that delimit the reach of federal criminal prosecutions.

Defendant's first argument for judgment of acquittal is that the Hobbs Act does not apply to local robberies and that the government's proof only establishes that the jewelry stores involved in this case were local businesses not involved in interstate commerce. Specifically, defendant contends that the legislative history of the Hobbs Act establishes that Congress did not intend to make all robberies federal crimes. Instead, defendant argues that the Act was passed as a means "to close the gaps in existing federal laws and to render more difficult the activities of predatory criminal gangs of the Kelly and Dillinger types." Defendant's Motion for Judgment of Acquittal at 5.

Defendant's second argument is that the Supreme Court's recent decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), invalidates Ninth Circuit precedent holding that the government need only show a de minimis effect on commerce to support a conviction under the Hobbs Act. Defendant argues that *Lopez* and its Ninth Circuit progeny, *United States v. Pappadopoulos,* 64 F.3d 522 (9th Cir.1995), require the government in this case to show a substantial effect on commerce to support a conviction under the Hobbs Act, which, defendant contends, it has not done.

In its opposition to the defendant's motion for judgment of acquittal, the government argues that Congress intended to reach all conduct within the express terms of the Hobbs Act, including the robberies at bar.

Furthermore, the government argues that *Lopez* and *Pappadopoulos* are inapplicable and that the Ninth Circuit's de minimis effect on interstate commerce standard still applies. The government also finds support in the Supreme Court's holding in *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960), in which the Court stated that the Hobbs Act was to be accorded substantial breadth in application.

To address these arguments, the court will first review the history of the Hobbs Act itself and pre-*Lopez* authority from the controlling jurisdictions, and then turn to *Lopez* and *Pappadopoulos.*

## III

### A

The present codification of the Hobbs Act does not make its genesis and motivating purpose as clear as might be hoped. The present form of the statute is a codification of a 1946 enactment which amended the Federal Anti–Racketeering Act of 1934. The Anti–Racketeering Act had been aimed at the "activities of predatory criminal gangs of the Kelly and Dillinger types." 91 Cong Rec 11848; see also *Evans v. United States,* 504 U.S. 255, 261, 112 S.Ct. 1881, 1885–86, 119 L.Ed.2d 57 (1992); *United States v. Local 807,* 315 U.S. 521, 535, 62 S.Ct. 642, 647–48, 86 L.Ed. 1004 (1942).[1] The multistate character of these types of criminal activities was thought to justify the exertion of the federal government's jurisdiction through the commerce power. 91 Cong.Rec. 11909–10 (1945); Investigation of So–Called Rackets: Hearings on S 489, 73rd Cong., 2nd Sess. 4, 81 (1934).

The present incarnation of the Hobbs Act was enacted soon after the close of World War II when Congress responded to a loophole in the legislation as it had been interpreted by the Supreme Court. The Anti–Racketeering Act had proscribed, in connection with interstate commerce, the exaction of valuable consideration by force, violence or coercion, "not including, however, the payment of wages by a bona-fide employer to a bona-fide employee." Federal Anti–Racketeering Act of 1934, § 2, 48 Stat. 979. This exception had been added by Congress after objections were raised by labor groups who felt the bill might restrict their activities. *United States v. Local 807,* 315 U.S. 521, 529, 62 S.Ct. 642, 645, 86 L.Ed. 1004 (1942).

In *United States v. Local 807,* however, the wage exception in the Anti–Racketeering Act led to the acquittal of union members who conspired to use and did use violence and threats to obtain an amount of money equal to a day's work from out-of-state truck drivers delivering shipments into New York. These union members failed to offer to work, or refused to work for the money when asked to do so. Id. at 526, 62 S.Ct. at 643–44.

■ The Hobbs Act was designed primarily to undo the wage exception and thereby make the type of racketeering activity in *Local 807* a federal crime even if committed by labor unions. 91 Cong.Rec. 11843, 11844, 11911. Congress' intent in passing the Hobbs Act was thus to amend the Anti–Racketeering act to ensure protection of the persons who use the highways in interstate commerce from highway robbery, id. at 11843, and was an effort to purge organized labor of the type of gangster activity which the Anti–Racketeering Act was intended to deter more generally. Id. at 11843; see also *Evans,* 504 U.S. at 261, 112 S.Ct. at 1885–86. Congress found that state laws were inadequate because the labor union racketeering of the type evident in *Local 807* occurred across state lines and involved politically influential groups that local law enforcement

1. In the summer and fall of 1933, the legendary John Dillinger was involved in numerous armed robberies occurring throughout several states of the Midwest, including Indiana, Ohio and Wisconsin. Jay Robert Nash, M. Evans, *Bloodletters and Badmen: A Narrative Encyclopedia of American Criminals from the Pilgrims to the Present* 200–19 (1995). Eventually, FBI agents, who had been on his trail for months at the request of police in several states, purportedly killed Dillinger as he was leaving the Biograph Theatre in Chicago. George "Machine Gun" Kelly, another famous gangster of the era, was a bootlegger, kidnapper and depression-era bank robber. His criminal activities took place in the states of Mississippi, Texas, New Mexico and Oklahoma. Id. at 359–63. Both Dillinger and Kelly were at one point designated as "Public Enemy Number One" by J. Edgar Hoover, director of the FBI at the time.

officers were wary of prosecuting. *Id.* at 11843. Accordingly, even as amended, Congress' original intent to deter professional gangsterism, as embodied in the Anti–Racketeering Act, remained embedded in the new statutory enactment. *Id.* at 11911; see also *United States v. Green*, 350 U.S. 415, 418–20, 76 S.Ct. 522, 524–26, 100 L.Ed. 494 (1956). The legislative histories of the Anti–Racketeering Act and Hobbs Act, taken together, thus demonstrate that Congress' intent was to enable the federal government to prosecute that species of robberies that local law enforcement had been unable effectively to pursue due its multistate nature and the ability of the perpetrators to elude effective enforcement by state and local officials.

## B

Despite the legislative background to the Hobbs Act, prosecutions under it soon moved beyond prototypical "gangster" criminal activities. Challenges to application of the Hobbs Act ensued. In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the defendant was charged with and convicted of unlawfully interfering with interstate commerce in violation of the Hobbs Act. At issue was whether the indictment had charged defendant with the offense with which he was convicted. Id. at 213, 80 S.Ct. at 271. The indictment had charged defendant with interfering, by way of extortion, with the interstate transport of sand into Pennsylvania from other states. At trial, however, the government was permitted to introduce evidence of additional interference with interstate commerce, in the form of steel shipments from the plant which was to be constructed, in part, from concrete made from the sand at issue. Id. at 214, 80 S.Ct. at 271–72.

The Court stated that the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence," and "outlaws such interference 'in any way or degree.'" Id. at 215, 80 S.Ct. at 272 (quoting 18 U.S.C. § 1951(a)). The Court noted that had the victim not complied with defendant's demands, the interstate shipment of sand to the plant would have slackened or stopped, and that "[i]t was to free commerce from such destructive burdens that the Hobbs Act was passed." Id.

The Court nevertheless reversed the conviction. The Court stated as follows:

> [T]here are two essential elements of a Hobbs Act crime: interference with commerce and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference. It follows that when only one kind of commerce is charged to have been burdened a conviction must rest on that charge and not another * * *.

Id. at 218, 80 S.Ct. at 274. Since the indictment could not fairly be read to charge interference with the movement of steel from Pennsylvania to other states, the introduction of that evidence raised the chance that the jury had convicted defendant of a crime with which he had not been charged. Given this ground for reversal, it is clear that the Court's comment regarding the scope of the Hobbs Act's coverage was dictum.

In *United States v. Culbert*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), the Court seized upon this dictum in support of its holding that the Hobbs Act was not limited only to acts of racketeering. The Court, citing to *Stirone*, stated as follows:

> the statutory language sweeps within it all persons who have "in any way or degree * * * affect[ed] commerce * * * by robbery or extortion." These words do not lend themselves to restrictive interpretation; as we have recognized, they "manifest * * * a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence," *Stirone v. United States*, 361 US 212, 215 [80 S.Ct. 270, 272, 4 L.Ed.2d 252] (1960).

Id. at 373, 98 S.Ct. at 1113. In its discussion, the Court also touched on the impact of the Hobbs Act on the "federal-state balance," noting that it was Congress's concern for lax

or ineffective state enforcement of these crimes that had motivated the legislation:

> With regard to the concern about disturbing the federal-state balance, moreover, there is no question that Congress intended to define as a federal crime conduct that it knew was punishable under state law. The legislative debates are replete with statements that the conduct punishable under the Hobbs Act was already punishable under state robbery and extortion statutes. Those who opposed the Act argued that it was a grave interference with the rights of States. Congress apparently believed, however, that the States had not been effectively prosecuting robbery and extortion affecting interstate commerce and the Federal Government had an obligation to do so.

Id. at 379–80, 98 S.Ct. at 1117 (internal citations omitted).

The Ninth Circuit has spoken more frequently (and more directly) on the jurisdictional requirements of the Hobbs Act. One of the earliest cases in the Ninth Circuit was *Battaglia v. United States*, 383 F.2d 303 (9th Cir.1967). In this case, defendant was convicted under the Hobbs Act for having, by threats, obtained space in a bowling alley for a coin-operated pool table and a share of the profits from its operation. Id. at 304. At trial, the parties stipulated that both the pool table that was removed from the bowling alley and the one supplied by defendant had been shipped from out of state. Defendant nonetheless argued that the requisite effect on interstate commerce had not been shown because the removed pool table was shipped first to a dealer within the state before it was delivered to the bowling alley. The court disagreed, citing to a case that had been reversed years before, *United States v. Stirone*, 168 F.Supp. 490, 496 (E.D.Pa.1957), aff'd, 262 F.2d 571 (3d Cir.1958), rev'd, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960):

> [A] deliberate act which tends to prevent articles from being used once they have reached their destination after being shipped in interstate commerce dams up the stream of commerce as surely as

though the same act had cut off the supply at its source.

Id. at 305–06.

In *United States v. Shackelford*, 494 F.2d 67 (9th Cir.1974), defendant was charged with extortion under the Hobbs Act for threatening to obstruct airline flights unless he received $270,000. Defendant argued that the government failed to prove the requisite effect on interstate commerce. Id. at 75. The Ninth Circuit disagreed and decided that the government had met its burden of proof because under the Hobbs Act "the effect on interstate commerce need only be to a minimal degree." See also *Carbo v. United States*, 314 F.2d 718, 732 (9th Cir.1963).

Building on this decision, the Ninth Circuit in *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.1978), stated that only a de minimus effect on interstate commerce need be shown under the Hobbs Act. The court further held that in order to establish this de minimus effect, the government need only produce evidence establishing that the assets of a business engaged in interstate commerce were depleted during the commission of the crime. Id. at 501. The *Phillips* de minimus standard and depletion of assets theory of interstate effect was reaffirmed by the Ninth Circuit in *United States v. Zemek*, 634 F.2d 1159 (9th Cir.1980). In that case, the court concluded that evidence that the victim of extortion purchased supplies and hired employees from out of state was a sufficient basis for federal jurisdiction under the Hobbs Act. Id. at 1173 n. 20.

In one of the very few reported robbery cases under the Hobbs Act, *United States v. Hanigan*, 681 F.2d 1127 (9th Cir.1982), defendant was convicted after he robbed three undocumented farm workers as they crossed the international border between Mexico and Arizona. The court decided that the laborers could be considered articles of commerce during their movement across the international boundary. Id. at 1130. The court further stated that commerce need not be legal commerce in order to be subject to the regulatory power of Congress over commerce. Since defendant through robbery had directly interfered with the movement of an article in commerce, the Ninth Circuit

concluded that jurisdiction under the Hobbs Act had been established. *Id.* at 1131.

In a more recent Hobbs Act extortion case, *United States v. Pascucci*, 943 F.2d 1032 (9th Cir.1991), defendant was convicted for threatening to deliver embarrassing materials directly to the victim's employer, which was a business engaged in interstate commerce. Defendant argued on appeal that the government had not adequately established a link between his conduct and interstate commerce. In rejecting defendant's argument, the court first reviewed the applicable standard for proving an interstate effect:

> The statutory language of the Hobbs Act displays a purpose to use all the constitutional power Congress has to punish interstate commerce by extortion, robbery or physical violence. Consistent with this approach, this court has held that an effect on interstate commerce is established by proof of an actual impact, however small, or in the absence of actual impact, by proof of probable or potential impact. Only a de minimus effect is necessary * * * and the effect [on commerce] need only be probable or potential, not actual. It is enough that the scheme, if successful, would have affected commerce.

*Id.* at 1035 (internal quotations and citations omitted).

The court concluded, somewhat cryptically, that this standard was met in the case before it:

> The principles expressed in these authorities lead us to conclude that the Government has shown a sufficient nexus to interstate commerce to support a conviction under [the Hobbs Act] in this case. By showing that the defendant made a credible threat to deliver embarrassing material directly to the victim's employer, who was then engaged in interstate commerce, the Government demonstrated that [defendant] introduced a potential impact on interstate commerce.
>
> Undoubtedly, there would have been an effect on interstate commerce if [defendant] had carried out his threat. [Plaintiff's] employer was engaged in interstate commerce and [defendant] threatened to deliver the tapes directly to the company.

The delivery of the tapes would have had the requisite effect on interstate commerce.

*Id.* at 1035.

Unfortunately, the Ninth Circuit did not specify what this "undoubted" effect might be, i.e., whether the victim's employer might fire or suspend him after receiving the letters, which theoretically might interfere with its interstate business, or whether the very time spent by its mail room and supervisory personnel in processing the letter constituted a depletion of the firm's assets so that there was de minimus effect on interstate commerce. Indeed, given the apparent breadth of *Pascucci*, there appears to be no principled distinction between extortion of the type in that case and a robbery of an employee of the same company on his way to work, which robbery causes the employee to be late or miss some days because of stress-related maladies. *Pascucci*, drawn to its logical conclusion, given the increasing interstate connections in all levels of business, would appear to indicate that any robbery of an employed person is a federal crime. Given the tenuous and speculative proof allowed to support the conviction, *Pascucci* thus appears to stand for the principle that, at least in the Ninth Circuit prior to *Lopez*, the interstate component of the Hobbs Act had indeed become the mere surplusage that the *Stirone* Court warned it should not become.

Similarly, in another pre-*Lopez* opinion reversing this court's dismissal of the indictment in this case, *United States v. Woodruff*, 50 F.3d 673 (1995), the Ninth Circuit, citing to *Phillips* and *Zemek*, held that only a de minimus effect on interstate commerce need be alleged in the indictment in order to establish jurisdiction under the Hobbs Act. The court noted, however, that its holding did not "absolve the government from proving an 'interstate impact' of the robberies at trial." *Id.*

### C

#### 1

The foregoing appears to have been the state of the law relative to the Hobbs Act

prior to the Supreme Court's decision in *United States v. Lopez.* In that case, the Court recognized that there is indeed an outer limit to what Congress may do under the Commerce Clause.[2] In *Lopez,* the Court addressed the constitutionality of the Gun Free School Zone Act, 18 U.S.C. § 922(q), which made it a federal offense for "any individual knowingly to possess a firearm at a place the individual knows, or has reasonable cause to believe, is a school zone." *Id.* at ——, 115 S.Ct. at 1625. The Court struck down the statute, finding that through it, Congress had attempted to legislate beyond its constitutional mandate.

In reaching this conclusion, the Court carefully reviewed the history of the Commerce Clause and noted that despite the broad reach it accords Congress:

> [The Commerce] power is subject to outer limits. In [*NLRB v.*] *Jones & Laughlin Steel [Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937)] the Court warned that the scope of the interstate commerce power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.

*Id.* at ———, 115 S.Ct. at 1628–29. Consistent with preserving this division of power, the Court identified three broad categories of activity that Congress may regulate under its commerce power: (1) the use of channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities; and (3) those activities having a substantial relation to interstate commerce, i.e. those activities that substantially affect interstate commerce. *Id.* at ———, 115 S.Ct. at 1629–30.

Applying these principles, the Court concluded that the Gun–Free School Zones Act could survive, if at all, only under the third category because it was not a regulation of the use of the channels of interstate commerce, not an attempt to prohibit the interstate transportation of a commodity through interstate commerce nor an attempt to protect an instrumentality of interstate commerce or a thing in interstate commerce. *Id.* at ——, 115 S.Ct. at 1630. The Court thus sought to determine whether the act regulated an intrastate activity that substantially affects interstate commerce. *Id.* The Court first noted that the statute was a criminal statute that, by its terms, had nothing to do with "commerce" or any sort of economic enterprise, and that "[u]nder our federal system, the 'States possess primary authority for defining and enforcing the criminal law,'" *Id.* at —— n. 3, 115 S.Ct. at 1631 n. 3 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 1720–21, 123 L.Ed.2d 353 (1993)), and when "Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *Id.* (quoting *United States v. Enmons,* 410 U.S. 396, 411–12, 93 S.Ct. 1007, 1015–16, 35 L.Ed.2d 379 (1973)).

The Court then observed that the statute was not an essential part of a larger regulation of economic activity, in which the regulatory system would be undercut unless intrastate activity were regulated. Accordingly, the Court concluded that the statute could not be sustained under its line of cases, e.g. *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), upholding regulations of activities that arise out of or are

---

2. The principle that congressional power under the Commerce Clause is subject to outer limits has been recently confirmed in *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In that case, the issue was whether the Indian Gaming Regulatory Act, which granted jurisdiction over a state that did not consent to be sued, was passed pursuant to a constitutional provision, the Indian Commerce Clause, granting Congress such power. *Id.* at ——, 116 S.Ct. at 1125. Chief Justice Rehnquist, writing for the majority, stated that there was no principled distinction between the Indian Commerce Clause and the Interstate Commerce Clause. *Id.* at ——, 116 S.Ct. at 1126. The Supreme Court held that Congress lacks authority, under the Indian Commerce Clause, to abrogate states' sovereign immunity under Eleventh Amendment. *Id.* at ——, 116 S.Ct. at 1131.

connected with a commercial transaction, which, viewed in the aggregate, substantially affect interstate commerce. *Id.*

Next, the Court noted that the statute contained no jurisdictional element to ensure, through a case-by-case inquiry, that the firearm in question affected interstate commerce. *Id.* In addition, the statute was not supported by legislative findings regarding the perceived interstate effects of the regulated activity, which findings, although not required, would have assisted the Court in determining whether there was a substantial effect on interstate commerce when none was apparent. *Id.*

As noted, the Court held that the Gun Free School Zone Act was not susceptible to preservation under the *Wickard* aggregation approach. The Court nonetheless explored why *Wickard,* even were it to be applied, could not save the statute. The government had contended that the possession of a gun in a school zone substantially affected interstate commerce in the aggregate in a number of ways, such as an increase in violent crime that places additional burdens on the functioning of the national economy, a reduction in the willingness to travel to areas that are perceived as unsafe, and a threat to the educational process that would reduce the productivity of the citizenry, which, in turn, would also substantially affect interstate commerce. Id. at ——, 115 S.Ct. at 1632. The Court rejected these arguments, stating that the implication of acceptance would be acknowledgement that there is no limit to the activities subject to federal regulation. *Id.* Under the rubric of reducing violent crime or increasing national productivity, for example, Congress could in essence fully usurp the areas of criminal, family and education law—areas traditionally reserved to the states. *Id.* The Court found that such usurpation simply was not contemplated by the Constitution.

Unwilling to accept the government's proffered rationales as they required piling "inference upon inference," the Court concluded that possession of a gun in a school zone was not an activity that, through repetition, might substantially affect interstate commerce. Accordingly, the Court struck down the stat-ute, lest the distinction between local and national spheres of power be forever lost. *Id.*

### 2

■ The profound and immediate impact of *Lopez* may be seen in a recent Ninth Circuit decision, *United States v. Pappadopoulos,* 64 F.3d 522 (9th Cir.1995). In this case, the same court that upheld the Hobbs Act conviction in *Pascucci* overturned a conviction under an analogous statute on the ground that the requisite link to interstate commerce had not been shown. At issue in *Pappadopoulos* was whether defendant's alleged role in the burning of her private residence was sufficient to sustain her conviction under 18 U.S.C. § 844(i), which provides as follows:·

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or commerce shall be imprisoned * * *.

*Id.* at 524. Thus, as with robbery under the Hobbs Act, it is an essential jurisdictional element of the crime that the arson affect interstate commerce. See *id.*

To establish this jurisdictional element, the government relied exclusively on one theory: that the private residence was used in, or used in an activity affecting, interstate commerce because it received natural gas from out-of-state sources. *Id.* at 525. The defendant challenged this theory and prevailed. The Ninth Circuit first stated that § 844(i), as has the Hobbs Act, has been interpreted as expressing an intent by Congress to exercise its full power under the Commerce Clause. As such, the court determined that the *Lopez* framework was applicable in this circumstance, despite the fact that *Lopez* concerned only the power of Congress to legislate in a particular area while the defendant in *Pappadopoulos* was challenging the enforcement of an otherwise valid statute against him because, in essence, the dispositive issue was whether Congress could have constitutionally prohibited the arson at issue. *Id.* at 525, 527.

In accordance with the *Lopez* framework, the Ninth Circuit noted that the residence at issue was neither an instrumentality of interstate commerce nor a channel of interstate commerce. Accordingly, the court concluded that the conviction could only be sustained if Congress could have regulated the activity as an intrastate one that substantially affects interstate commerce. *Id.* at 526–27. In this regard, the government essentially conceded that it could show no direct substantial effect, but nonetheless sought to rely on the *Wickard* aggregation line of cases, contending that "even though the effect on commerce of the destruction of one residence that receives out-of-state gas might be trivial, the combined effect of many others similarly situated, is far from trivial." *Id.* at 526. The Ninth Circuit rejected this argument and declined to apply the *Wickard* aggregation approach, stating "like the statute at issue in *Lopez,* and unlike the case in *Wickard,* the conduct regulated by section 844(i)—arson— is not commercial or economic in nature." *Id.* The court thus held as follows:

> We conclude that in a case such as this, where Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection to the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings, the government must satisfy the jurisdictional requirement by pointing to a "substantial" effect on or connection to interstate commerce.

*Id.* at 527.

The Ninth Circuit found that the government had not met this standard. The private residence had no commercial character, nor was it an article or instrumentality of interstate commerce. Rather, the regulated activity, arson, had only the remotest connection to interstate commerce, precluding application of the *Wickard* aggregation approach. As the government had not otherwise shown anything beyond a trivial or de minimus impact on interstate commerce, the court overturned the conviction on jurisdictional grounds.

**3**

The Ninth Circuit has issued one post-*Lopez* Hobbs Act decision. In *United States v. Huynh,* 60 F.3d 1386 (9th Cir.1995), defendant was charged with extortion under the Hobbs Act for threatening to interrupt the mailing of federal Social Security Insurance checks across state lines. On appeal, defendant argued that the requisite nexus between her crime and interstate commerce had not been adequately established.

The Ninth Circuit found the requirement to have been satisfied. Citing to *Pascucci,* the Ninth Circuit stated that proof of an actual impact, however small, or in the absence of actual impact, proof of a probable or potential impact, will satisfy the effect in interstate commerce requirement of the Hobbs Act. *Id.* at 1389. The Ninth Circuit further noted that it had upheld convictions under the Hobbs Act even where the connection to interstate commerce was slight. *Id.* (citing to *Pascucci, Hanigan* and *Phillips*). Applying this standard, the Ninth Circuit held that the district court correctly concluded that interstate commerce was affected by Huynh's threats to use her official powers to prevent or interrupt the interstate movement of federal funds.

In reaching this conclusion, the *Huynh* court inexplicably failed to analyze the defendant's conduct in light of *Lopez.* Despite the clear factual distinguishability of *Huynh* from this case, the government thus argues that *Huynh* stands for the principle that a de minimus connection to interstate commerce is all that need be shown under the Hobbs Act, that is, that *Huynh* holds that *Lopez* is irrelevant to the Hobbs Act.

The court refuses to attach such significance to the Ninth Circuit's failure to analyze and apply *Lopez* in *Huynh.* Defendant in *Huynh* was charged with extortion for her threat to interfere with the movement of federal funds across state lines. Both the federal interest implicated and the link between her actions and interstate commerce was thus clear and would have, with little doubt, satisfied *Lopez* had the Ninth Circuit chosen to apply it. The court thus cannot conclude that the absence of a discussion of *Lopez* means that *Lopez* does not apply to

crimes charged under the Hobbs Act in the Ninth Circuit. Instead, the *Huynh* court's failure to confront *Lopez* renders it inapposite, as this court must still be guided by the teachings of the Supreme Court in *Lopez*, as further developed by the Ninth Circuit in *Pappadopoulos*.

### D

Given *Lopez* and *Pappadopoulos*, it appears that the de minimus approach of the past to interstate commerce jurisdictional inquiries is no longer good law—*Pascucci, Woodruff* and their predecessors can no longer be considered controlling for a case such as the one at bar. Instead, however expansive a gloss previous decisions may have placed on the Hobbs Act, this court must now proceed under principles laid down in *Lopez* and *Pappadopoulos*.

■ Accordingly, the court must examine under which of *Lopez*'s three categories of constitutionally regulatable activity the alleged Hobbs Act violation falls. Necessarily, this must be a case-by-case inquiry as the Hobbs Act itself does not expressly limit itself to any one category of robbery.

There is no dispute that the jewelry stores involved in this case were neither channels of interstate commerce nor instrumentalities of interstate commerce, thus precluding reliance by the government on the first *Lopez* category. The government contends, however, that its prosecution of the defendant in this case is constitutional under the second *Lopez* category because some of the pieces of jewelry had been transported in interstate commerce. Limited support for this proposition may be found in *United States v. Hanna*, 55 F.3d 1456 (9th Cir.1995), in which the Ninth Circuit upheld 18 U.S.C. § 922, which makes it illegal for certain persons, including felons, "to ship or transport in interstate commerce, or possess in or affecting interstate commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate commerce." In *Hanna*, the Ninth Circuit read this statute to reach receipt of a firearm that had traveled, at any time previously, in interstate commerce. *Id.* at 1462.

The court declines to apply the apparent broad reach of *Hanna* to this case. Noting the troubling implications of *Hanna*, the Ninth Circuit later observed in *Pappadopoulos* that "[b]ecause of its relatively restrictive language, section 922 can rationally be seen as regulating the interstate transportation of firearms and ammunition." The Hobbs Act contains no such inherent limiting language and, as such, the court will not extend it to encompass without restriction the robbery of any good that has traveled in interstate commerce at some point in the past, however distant that past may be.

Instead, the court looks to the standard generally applied in this circumstance under which Congress' power to regulate articles or goods in commerce does not "permit it to regulate an item for eternity simply because it has once passed state lines." *Pappadopoulos*, 64 F.3d at 527 (citing *United States v. Nukida*, 8 F.3d 665, 671 (9th Cir.1993) (collecting cases regarding the loss of an item's interstate character)). No precise rule exists for determining when an interstate movement has come to an end. The question is one of fact, to be resolved by the jury. See *Nukida*, 8 F.3d at 671.

In this case, the jury was not presented with this question nor instructed regarding it as the government's theory of the case did not rest jurisdiction on proof that the jewelry was an article in commerce. To the extent evidence in this case was developed on this point, it is plain that most of the customers of the four stores involved here resided in or near the stores themselves; the stores drew most of their customers from their localities. To be sure in a peripatetic society, some customers are bound to come from outside the locality of these stores, and undoubtedly a number of customers of the stores here did so. Furthermore, people who reside in one place often later move, sometimes out of state.

Notwithstanding these facts of modern life, the government at trial simply failed to show that the merchandise of each of the stores continued to move in interstate commerce after coming into their inventories. Three of the stores are almost quintessentially local—locally owned, locally operated, small inde-

pendent businesses. Only the Shreve store was part of a chain. This fact alone, however, does not suggest that the merchandise that came into its inventory had not completed its journey through interstate commerce. In sum, the government failed to prove that the jewelry remained in interstate commerce after its arrival at the stores, and no rational jury, even had it been presented with the question, which assuredly the jury in this case was not, could have concluded otherwise. Accordingly, the government cannot rely on this route to establishing jurisdiction.

Indeed, undoubtedly recognizing this fact, the government does not appear seriously to contend that the merchandise continued in interstate commerce after coming into the stores' inventory. Instead, the government premises jurisdiction on the effect of defendant's actions on interstate commerce. The government argues that an effect on interstate commerce has been proven because each of the stores had to, or would have had to, purchase replacement inventory from out of state and because the assets of the stores were depleted.

The government's showing in this case could arguably have sufficed under a depletion of assets theory as described in *Phillips*, *Zemek* and *Woodruff*, which required only a de minimus connection to be shown. It is plain from *Lopez* and *Pappadopoulos*, however, that such a showing will suffice no longer. Because defendant's conduct was not in a channel of interstate commerce or directed at an instrumentality of interstate commerce, the government in order to carry its burden of proof in this case was required to show a substantial effect on interstate commerce from defendant's conduct.

1

One manner by which the government might have attempted to show this substantial effect would have been proof that the robberies and attempted robberies in this case actually had a substantial effect on interstate commerce. The government, however, vigorously resisted allowing the court to instruct the jury that a substantial effect had to be shown, and, as a direct result of the government's arguments, no such substantial effect instruction was given. In-

stead, the court instructed the jury only that the government had to show an effect on interstate commerce. As such, the government did not purport to make such an evidentiary showing and did not argue in closing that a substantial effect was present in this case.

The government's intransigence on this issue, however, has forced the court to turn to the facts of the instant case to determine whether the jury could reasonably have concluded that the government proved that each robbery had a substantial effect on interstate commerce. During trial, the government argued that the fact that each store had to, or in the case of the attempted robbery, would have had to, replenish its inventory shows an effect on interstate commerce. The government contends that the demand for jewelry from out of state increased as a result of the robberies and thereby affected commerce. Furthermore, the government contends that the fact that the robberies depleted, or would have depleted, the stores' revenues and prevented the owners from conducting business is enough to satisfy the requisite effect on commerce.

At trial, the government did not show that Mark Areias, Shreve & Co. or Sam Bloch were prevented, or even impaired, from purchasing goods, as they normally do, from out of state. In fact, the witnesses for the government testified to the contrary. With regard to Mark Areias Jewelers, Nicolle Callahan testified that there was no change in the way the store dealt with out-of-state suppliers and that the store still purchases the same amount of inventory from out of state as it did before the robberies. Peter Fogel, former president of Shreve & Co. also testified that his company did not reduce its inventory or change its out-of-state buying practices as a result of the robbery. The attempted robbery at Sam Bloch Jewelers also did not interfere with the buying practices of that store. Although the government need only show that the attempted robbery would have affected interstate commerce if the defendant had successfully and fully completed his actions, no such showing was made.

The record does show that the robbery at Golden Treasures curtailed the store's purchase of out-of-state materials. Arthur Oppenheimer, the owner of the store, testified that he made approximately 75% of the jewelry he sold. The jewelry was made from component parts purchased from out of state. Oppenheimer testified that he sold some jewelry to out-of-state customers and the robbery, which resulted in the loss of approximately $118,000 worth of jewelry, interfered with this aspect of his business. He testified that he could not conduct business as usual because he did not have the necessary parts to manufacture the jewelry he sold to out-of-state customers. A jury could infer that the robbery was the cause of his inability to obtain the component parts necessary to manufacture the jewelry.

With the exception of Golden Treasures, the stores were not prevented from purchasing inventory from out of state and continued to do business in the same fashion that they did before the robberies. The interstate operations of the businesses were not obstructed or delayed. Furthermore, even though Golden Treasures' interstate business was impaired, the government failed to show a substantial effect on commerce. A majority of Golden Treasures' customers were local residents. The store's inventory turned over only every two years, indicating that although the component parts for the jewelry made by Golden Treasures' proprietor may have come from out of state, the goods ceased their connection with interstate commerce upon arrival at Golden Treasures. There was no evidence showing that a significant amount of interstate transactions were affected by the Golden Treasures robbery. Indeed, of the four stores involved in the robberies at bar, Golden Treasures is a quintessentially local one. Oppenheimer is a sole proprietor who typically has no employees, choosing to operate the store by himself. As noted earlier, he makes the jewelry he sells; it is hand-crafted in a work shop on the store's premises. Montclair, the site of the store, is a largely residential portion of the East Bay area. The robbery of such a business, although enormously tragic in personal terms to its proprietor Oppenheimer, cannot be said to have more than a trivial effect on interstate commerce.

Additionally, the fact that the stores were closed for short periods of time does not establish a substantial effect on interstate commerce. The witnesses at trial all testified that a majority of their customers were local residents. Only occasionally did residents of foreign states purchase goods from the jewelry stores. Therefore, there is insufficient evidence from which a jury could conclude, beyond a reasonable doubt, that interstate commerce was substantially affected.[3]

2

Alternatively, the government, relying on the *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), line of cases, could have shown a substantial effect on interstate commerce in this case if, in the aggregate, activities of the type prosecuted here would have a substantial effect on interstate commerce. If applicable, this aggregation approach would relieve the government of showing a substantial effect on interstate commerce from the actual robberies at bar.

A brief digression into the mechanics of the aggregation approach is necessary to delineate what the government should have shown in order to rely on this approach. In *Wickard*, the Court upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of homegrown wheat. *Id.* at 128–29, 63 S.Ct. at 90–91. The Court explicitly refused to draw distinctions between direct and indirect effects on interstate commerce, stating as follows:

> [E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be

3. Given this result, the court need not ponder what result would be appropriate had it concluded that the jury might have been able to find a substantial effect, but simply was not given the opportunity to do so. Such a circumstance would appear to dictate either granting a judgment of acquittal under an analog to the invited error doctrine, see *United States v. Baldwin*, 987 F.2d 1432, 1437 (9th Cir.1993) (party inducing error may not complain of the results of that error), or, at a minimum, a mistrial, see *United States v. Affinito*, 873 F.2d 1261, 1265 (9th Cir. 1989).

reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect might at some earlier time been defined as "direct" or "indirect." *Id.* at 125, 63 S.Ct. at 89. As noted by the *Lopez* Court, in *Wickard*, the Court emphasized that although Filburn's own contribution to the demand for wheat may have been trivial by itself, that was not "enough to remove him from the scope of federal regulation, where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1628 (quoting *Wickard*, 317 U.S. at 127–28, 63 S.Ct. at 90–91).

*Lopez* and *Pappadopoulos* recognize that there are outer boundaries to this "aggregation" approach. The approach is not universally applicable: to protect our dual system of government, *Wickard* cannot be extended " 'to embrace effects on interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' " *Lopez*, —— U.S. at —— – ——, 115 S.Ct. at 1628–29 (quoting *NLRB v. Jones & Laughlin Steel Corp*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). *Wickard* may thus not be applied, through the guise of relatively trivial effects on interstate commerce, to excuse broad congressional regulation of state and private activities. *Id.* at ——, 115 S.Ct. at 1629. Rather, " '[t]he Court has said that where a general regulatory statute bears a substantial relation to commerce, the de minimus character of individual instances arising under that statute is of no consequence.' " *Id.* (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)). Stated differently, where economic activity substantially affects interstate commerce, legislation regulating that activity, even on the intrastate scale, will be sustained. *Id.* at ——, 115 S.Ct. at 1630.

In *Lopez*, the Court found that possession of a gun in a school zone was not an economic activity that might, through repetition, substantially affect interstate commerce. *Id.* at ——, 115 S.Ct. at 1634. Similarly, in *Pappadopoulos*, the Ninth Circuit held that arson of a private residence, even if that residence is connected to an interstate natural gas supplier, was not an economic or commercial activity that merited application of the *Wickard* approach. *Pappadopoulos*, 64 F.3d at 526. In this case, the court need not, and does not, find, however, that *Wickard* can never apply under the Hobbs Act, and need not rest its ruling in this case on a finding that *Wickard* could not apply to the case at bar. The Hobbs Act is to be applied to allow the full exercise of federal jurisdiction. Accordingly, when the robbery at issue is part of a larger illicit economic enterprise—i.e. the robbery is one of a "class" of robberies that substantially affect commerce, such as one driven by organized crime—aggregation might be appropriate.

A prototypical example of such a circumstance can be found in a Supreme Court case predating *Lopez, Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). In *Perez*, defendant had been convicted under the Consumer Credit Protection Act, 18 U.S.C. § 891, et seq., of "loan sharking" activities, that is, the unlawful use of extortionate means in collection and attempting to collect an extension of credit. Defendant challenged his conviction on the ground that Congress had no constitutional power under the Commerce Clause to police local loan sharking activities. *Id.* at 146–49, 91 S.Ct. at 1357–59.

The Court upheld the statute. The Court noted that, as is true with the Hobbs Act prosecution at bar, the loan sharking statute was to be evaluated under the third category of Commerce Clause powers, i.e. those activities that affect interstate commerce. *Id.* at 150, 91 S.Ct. at 1359–60. Relying on *Wickard* and its progeny, the Court stated that where it is a class of activities that is regulated and that class is within the reach of federal power, courts did not have the power to "excise, as trivial, individual instances" of the class. *Id.* at 154, 91 S.Ct. at 1361–62 (quoting *Wirtz*, 392 U.S. at 193, 88 S.Ct. at 2022). With regard to loan sharking, the Court observed that Congress had made explicit and extensive findings that this type of

activity was controlled by interstate organized crime to the detriment of interstate commerce. *Id.* at 149–50, 154–57, 91 S.Ct. at 1359–60, 1361–63. Accordingly, as Congress had found that this class of activity had substantial, broad ranging effects on interstate commerce, prosecution of one instance of that activity was constitutional, despite the lack of showing that that one instance itself substantially affected commerce.

■ The Court has stated that Congress is not normally required to make formal findings as to the substantial burdens that a class of activity places on interstate commerce. *Lopez,* ── U.S. at ──, 115 S.Ct. at 1631. The Court has also indicated, however, that such findings may aid courts in assessing interstate effect, when none is facially apparent. *Id.* at ──, 115 S.Ct. at 1632. In the case at bar, there are no congressional findings that the type or class of local robbery committed by defendant in this case has potential detrimental implications for interstate commerce. Nor are there findings that the type of local robbery committed by defendant is even of the type or class, that is, relating to organized crime, that Congress even contemplated for prosecution under the Hobbs Act. Accordingly, the issue boils down to this: did the government's evidence at trial suffice to replace the missing congressional findings so that the *Wickard* aggregation theory should be applied?

The court concludes that it did not. In order to show that the class of activity is subject to regulation, the government must show that there is some likelihood of repetition to this activity, which repetition will substantially effect commerce, not solely that, if repeated ad infinitum, the activity will substantially effect commerce. Allowing the government to aggregate without any basis for doing so would open the door to the unbounded piling of inference upon inference: to do so would not only allow the inclusion of nearly every imaginable robbery within the reach of the Hobbs Act, including, for example, the robbery of an individual on the way to work at a business engaged in interstate commerce (for if every person were robbed, work would be halted or delayed, and the interstate economy could grind to a halt), but would also be contrary to Ninth Circuit precedent.

Specifically, the Ninth Circuit in *Pappadopoulos* declined to aggregate blindly the effects of arson of a private home connected to a natural gas supply, even though it would appear beyond dispute that burning down every private residence in California, or even a substantial number of them, would have a profound effect on the market for interstate natural gas supplies. See *Pappadopoulos,* 64 F.3d at 526–28. Clearly then, resolution of this issue cannot be reduced to mere multiplication.

In this case, the government made no showing that the type of robbery committed by defendant is likely to be repeated and that this repetition will substantially affect commerce. The government introduced no evidence, for example and by way of illustration only, that defendant's activities were part of an organized criminal venture or a subset of a larger crime spree that had the potential to affect interstate commerce to any substantial degree.[4] Merely classifying robbery as an activity affecting interstate commerce does not suffice (and cannot, lest bootstrapping be a legitimate manner of establishing jurisdiction).

Furthermore, the court itself sees no necessary correlation between the local robberies at bar and a substantial aggregate effect on interstate commerce and is unwilling to engage in speculation in this regard. See *Lopez,* ── U.S. at ──, 115 S.Ct. at 1634 ("To uphold the Government's contentions

---

4. In its supplemental brief filed in response to the court's tentative decision, the government states that it attempted to introduce such evidence, but was rebuffed by the court. Supp Brief at 12. Although the government is technically correct, its characterization of the exclusion of the evidence is misleading. The government argued for admission under FRE 404(b) of evidence that defendant had been involved in similar crimes in Oregon. The government sought to introduce this evidence to prove identity and/or absence of mistake, accident or coincidence. The government did not seek to introduce the evidence to show the effect of defendant's activities on interstate commerce, and at no point prior to or during the trial did the government seek to revisit this issue.

here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."). Accordingly, as the substantial effect of defendant's criminal activities in the aggregate on interstate commerce is not facially apparent and, given this, as there are no relevant congressional findings or evidence from the government demonstrating such an effect, the court declines to find jurisdiction under this approach.

In so finding, the court recognizes that it is in disagreement with *United States v. Bruce*, 78 F.3d 1506, 1509 (10th Cir.1996); *United States v. Farmer*, 73 F.3d 836, 843 (8th Cir. 1996); *United States v. Bolton*, 68 F.3d 396, 399 (10th Cir.1995); and *United States v. Stillo*, 57 F.3d 553, 558 n. 2 (7th Cir.1995). With due deference to these courts, it is this court's view that application of the Hobbs Act in the manner these courts have proposed is fundamentally inconsistent with *Lopez*, and, moreover, incorrectly avoids confrontation with, and the very need to, draw a line demarking the boundaries between federal and state authority. To be sure, this line may move with the evolution of commerce and technologies; there must, however, be standards by which that line may be discerned.

## E

The court's analysis of this issue has obviously led it to conclude that it erred in instructing the jury regarding the impact on interstate commerce that the government had to show. The issue remains what consequence must flow from this error. As the court's review of the evidence has convinced it that no reasonable juror could have concluded that defendant's conduct had a substantial effect on interstate commerce and the evidence before the court is not sufficient to allow the government to benefit from the *Wickard* aggregation theory, the court is left with no alternative but to GRANT defendant's motion for acquittal.

## IV

The court is fully aware that this ruling will come as little comfort to the victims in this case. Defendant's actions endangered innocent persons and deprived them of their property—acts criminal under the laws of the state of California. The issue of which jurisdiction should have proceeded with prosecution of defendant is not one linked to the importance of the crimes. Violations of state criminal laws are not necessarily any more or less important than violations of federal criminal laws. Indeed, effective enforcement of state criminal laws is probably of greater importance to the safety and well-being of most people in the nation than is enforcement of federal criminal laws. The crimes that most grievously tear the social fabric are usually state law crimes. To conclude that this case is not appropriate for the exercise of federal authority in no way suggests that it is unimportant or beneath the dignity of the federal government.

The issue is one of responsibility: local crimes of the type herein should be dealt with locally, in the manner dictated by state and local laws, rather than by unelected federal prosecutors and judges. Had these robberies been prosecuted as they normally would have been, the trials would have been completed long ago at courts in the communities affected by these events and the victims would have had the relief that comes with closure. By seeking this novel extension of the Hobbs Act and by attempting to force federal authority into an area traditionally reserved to the states, and, moreover, in an area in which the state has shown no need of assistance, federal prosecutors have made this impossible.

Both the Supreme Court and the Ninth Circuit have recognized that the states, not the federal government, "possess the primary authority for defining and enforcing criminal law." See *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631; *Pappadopoulos*, 64 F.3d at 527. When Congress federalizes what is traditionally considered a state crime, it effects a "change in the sensitive relation between federal and state criminal jurisdiction." *Lopez*, —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3. The division of authority was

"adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). "The federalization of state crimes epitomizes the very tendency most feared by those who wrote and ratified the Constitution: a strong central government relegating to itself all power." *United States v. Ornelas*, 841 F.Supp. 1087, 1093 (D.Colo.1993).[5] It is the court's duty to interpret laws passed by Congress' under the commerce power so that they are constitutionally applied in each case.

In addition to the limitations imposed by the Constitution, there are practical reasons for construing federal criminal laws more narrowly where local activity is involved. Overlapping federal and state offenses have caused federal and state prosecutors to compete, rather than cooperate, in the prosecution of criminal cases. Stephen Chippendale, Note, *More Harm Than Good: Assessing Federalization of Criminal Law*, 79 Minn. L.Rev. 455, 468 (1994). Federal prosecution of local crime depletes the resources of the federal law enforcement agencies and encourages some state and local governments to rely on federal prosecution. *Id.* As a result, federal prosecutors often ignore complex interstate criminal activity and state and local governments shift their resources away from law enforcement. *Id.* Thus, criminal activity that violates both state and federal law should be prosecuted in state court unless a case for federal prosecution has been made.

Federal prosecution is arguably more desirable than state prosecution when the proscribed activity involves substantial multistate or international aspects. See Thomas M. Mengler, *The Sad Refrain of Tough on Crime: Some Thoughts on Saving the Federal Judiciary from the Federalization of State Crime*, 43 Kan.L.Rev. 503, 506 (1995). Additionally, federal prosecution is preferred when the proscribed activity involves state or local public corruption or other highly sensitive issues requiring a forum removed somewhat from local influence. *Id.* When the proscribed activity involves a highly sophisticated enterprise that is beyond the resources or expertise of the state, federal prosecution may also be warranted. *Id.* Nothing in the present record, however, explains why the resources of the national government were required in this case.

As stated eloquently by the Second Circuit in limiting application of the Hobbs Act in another circumstance:

> It is the sensitive duty of federal courts to review carefully the enforcement of our federal criminal statutes to prevent their injection into unintended areas of state governance. Exercising that duty, we find it necessary to nullify this attempted application of the Hobbs Act to circumstances it was never meant to reach. Incremental extensions of federal criminal jurisdiction arguably present a more pernicious hazard for our federal system than would bold accretion to the body of federal crimes. At a minimum, a clear extension of federal responsibility is likely to be sufficiently visible to provoke inquiries and debate about the propriety and desirability of changing the federal-state balance. Less abrupt, more subtle expansions, however, such as nearly occurred here, are less likely to trigger public debate, and, yet, over time cumulatively may amount to substantial intrusions by federal officials into properly left to state enforcement. By [our] holding * * *, we seek to demarcate a point beyond which congress intended federal prosecutors not to pass.

*United States v. Capo*, 817 F.2d 947, 955 (2d Cir.1987). This court too has drawn a line and found, based on the law and evidence before it, that the government has crossed that line in this case.

## V

Forewarned that the court might reach the foregoing conclusion by the court's release of its tentative decision, the government has moved for detention of defendant pending its appeal of this order.

---

5. In this case Judge Carrigan, after expressing his disdain for the federalization of criminal law, reluctantly upheld the same statute that was ultimately ruled unconstitutional by the Supreme Court in *Lopez*.

18 U.S.C. § 3143(c) provides for detention of a defendant pending appeal by the government. The standards to be applied by the court are identical to those the court employs under the pretrial bail statute, 18 U.S.C. § 3142. The court must consider the following factors: (1) the nature and circumstance of the offense charged, including whether it is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including * * * past conduct and criminal history, and whether at the time of the offense, the defendant was on parole; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

As reviewed earlier in this order, the evidence before the court was sufficient for the jury to conclude that defendant had participated in a series of dangerous and violent robberies. The court has not disturbed those factual findings. The record in this case also demonstrates that defendant has a long criminal history, including convictions for theft-related offenses, and, indeed, was on parole when he committed the robberies in this case. The record further reveals that defendant has a history of violating his conditions of parole.

In light of these factors, which the court has reviewed only cursorily here in light of the extensive trial record in this case, and despite the offer of defendant's father to offer him employment and others of security for his release, the court concludes that no reasonable conditions of release would adequately protect the community during the pendency of this appeal nor ensure the presence of defendant before this court should the jury's conviction be reinstated. Accordingly, the court ORDERS defendant detained pending appeal.

## VI

For the foregoing reasons, the court ORDERS as follows:

(1) Defendant's FRCrP 29 motion for judgment of acquittal is GRANTED.

(2) Defendant is ORDERED DETAINED pending the government's appeal of this matter.

IT IS SO ORDERED.